379 S.E.2d 752

**Dorothy Marie JOHNSON**

v.

**FARMERS & MERCHANTS BANK, et al.**

**No. 17690.**

Supreme Court of Appeals of West Virginia.

March 27, 1989.

James C. West, Jr., Lewis A. Clark, Jones, Williams, West & Jones, Clarksburg, Clyde Johnson, et als.

Ray Byrd, Thomas G. Byrum, Schrader, Stamp, Byrd, Byrum & Companion, Wheeling, for appellee.

Charles S. Armistead, Baker & Armistead, Morgantown, for Ora Lee J. Kirk & Rosedale Coal Co.

Charles Crooks, Herschel Rose, Jeffrey Jackson, Rose, Padden & Petty, Morgantown, for F & M Bank as Executor.

J. Michael McDonald, J. Michael Benninger, McNeer, Highland & McMunn, Clarksburg, for F & M Bank as Trustee.

BROTHERTON, Justice:

The appellants, the trustee and principal beneficiaries of an inter vivos trust established by Fred O. Johnson, appeal an order of the Circuit Court of Monongalia County, granting summary judgment in favor of the appellee, Dorothy Marie Johnson, the widow of Fred O. Johnson. As a result of the summary judgment ruling, the trust was declared invalid and the trustee was ordered to transfer a portion of the trust assets to the Executor of Fred O. John-

son's Last Will and Testament in order to satisfy Dorothy Marie Johnson's elective share. The appellants ask this Court to reverse the summary judgment order entered below and enter summary judgment in their favor upholding the Fred O. Johnson inter vivos trust or, in the alternative, remand the case to the circuit court for trial upon the factual issues.

Fred O. Johnson and Dorothy Marie Johnson were married on May 6, 1963. There were no children of this marriage, but Mr. Johnson has two adopted sons from a previous marriage, Clyde and Jerry Johnson, and they, along with their wives and children, are parties to this case. Mrs. Johnson has four daughters from her first marriage for whom Mr. Johnson made no provisions in either the trust or his will, and thus they are not involved in this litigation.

Mr. Johnson accumulated wealth in excess of $1,000,000 during his lifetime. That wealth was represented by varying degrees of ownership in three closely-held corporations as well as real estate and cash. The closely-held corporations were Mountaineer Farms, Inc., a large working farm located in Garrett County, Maryland, in which his 724 shares represented complete ownership; Rosedale Coal Company, in which Johnson maintained a minority interest evidenced by 73.666 shares of stock; and Steel Supply Company, in which Johnson owned 94 shares of outstanding stock, while remaining shares were held by his son, Clyde, who worked at Steel Supply Company, and his wife, Dorothy Marie Johnson. Mr. Johnson worked primarily in a management capacity, overseeing the day-to-day operation of these three businesses.

Shortly after they were married, Mr. Johnson deeded to Dorothy a one-half interest in his house, a tenancy in common without the right of survivorship, and this house became the marital domicile. Mrs. Johnson was a homemaker throughout the marriage, and she provided care for her own four daughters as well as Mr. Johnson's sons, who were in their early teens at the time of the marriage.

In her deposition testimony Mrs. Johnson stated that her husband was a "wonderful provider" as far as "home and food" were concerned, but she considered him to be "stingy" with regard to giving her money for her personal use. Mrs. Johnson retained one bank account from her first marriage, which contained approximately $9,000–$12,000, her share of the sale proceeds from that marital home. Mr. Johnson did not give his wife an allowance, but at some point later in their marriage he put her on the payroll at Steel Supply Company and paid her $100 every two weeks. She continued to receive this check until just after Mr. Johnson's death. She occasionally cleaned the office or answered the telephone there, but Mrs. Johnson indicated that her husband's purpose in putting her on the payroll was to allow her to collect social security. He told her that if anyone ever inquired, she was to tell them she was vice-president of the company. In 1977, Mr. Johnson purchased a new Mercedes Benz automobile which was titled in the name of Steel Supply Company but which Mrs. Johnson used as her own until after her husband's death.

Mrs. Johnson stated that she knew very little about her husband's business affairs and, although they filed joint tax returns, she did not know the amount of his annual income. The Johnsons did not jointly maintain or own assets except for a 1982 Eagle automobile and a checking account which was used primarily by Mr. Johnson to pay household bills and expenses.

Mr. Johnson suffered from diabetes and was in failing health in his later years. Fearing that the loss of his eyesight would end his ability to transact business, Mr. Johnson began consulting with an attorney, George R. Farmer, Jr., in February, 1982.[1]

---

1. These consultations initially involved the preparation of a Stock Purchase Agreement. On February 16, 1982, Johnson and his sister, Ora Lee J. Kirk, executed a Stock Purchase Agreement for stock in Rosedale Coal Company with a fixed purchase price of $750.00 per share. Under the terms of their agreement, upon the death of either of them the survivor would have the right to purchase the decedent's seventy-

On March 24, 1982, Mr. Johnson signed a Trust Agreement dated March 11, 1982, which was then executed by Delbert R. Baker, a trust officer, on behalf of the Farmers and Merchants Bank (hereinafter referred to as "F & M Bank"), as Trustee, on March 25, 1982. Contemporaneously with the execution of the Trust Agreement, Mr. Johnson executed a Last Will and Testament which was also prepared by Mr. Farmer. Mrs. Johnson was not aware of her husband's estate planning activities.

Mr. Johnson was the lifetime beneficiary of the income from the trust created by the Trust Agreement. Upon Mr. Johnson's death, the trustee was directed to place $250,000.00 in cash in a trust (referred to as "Fund A") for the benefit of Dorothy Marie Johnson, who was entitled to receive the income generated by this fund for life. The trustee was also given the power to invade the trust corpus if the trustee ever determined that the income was insufficient to provide for the comfortable support of Dorothy Marie Johnson.

After Fund A was fully funded, the trust agreement provided that the remainder of the trust property would become Fund B, a trust fund established for the benefit of Clyde and Jerry Johnson, who would receive income from the trust quarter-annually and be entitled to receive any and all of the fund's remaining principal upon reaching fifty years of age. Following the death of Dorothy Marie Johnson, Fund A was to be consolidated with the balance of the trust assets in Fund B.

Mr. Johnson reserved the right to amend, modify, or revoke the trust, and to invade the corpus of the trust. He also reserved voting rights in Johnson family corporation stock. According to provisions in the Trust Agreement, stock in the Johnson family companies could be sold only when Mr. Johnson directed the trustee in writing to do so. Two spendthrift provisions were included in the trust, one specifically applicable to Dorothy Marie Johnson's interest, and a general provision applicable to all beneficiaries.

The F & M Bank accepted the trust as trustee on March 25, 1982. Mr. Johnson delivered securities to the bank to be held pursuant to the Trust Agreement. Among these securities were seven F & M Bank Money Market Certificates of Deposit, as well as certificates for 724 shares of Mountaineer Farms, Inc. and 73.666 shares of Rosedale Coal Company, which were endorsed by Fred O. Johnson in blank on March 24, 1982.[2] Mr. Johnson also delivered certificates for all of his shares in Steel Supply, Inc., and he endorsed these certificates to "F & M Bank as trustee." These securities were not reissued in the name of F & M Bank by the issuing corporation, but were simply held by F & M Bank as trust assets.

In addition to executing the Trust Agreement on March 25, 1982, Mr. Johnson wrote a letter to the Chief Executive Officer of F & M Bank, Lewis C. Pellegrin, which contained terms relevant to the execution of the Trust Agreement. In the letter Mr. Johnson referred to past discussions between his attorney, Mr. Farmer, and Mr. Pellegrin which led to a subsequent agreement that "... I [Mr. Johnson] may manage the trust property during my lifetime in any manner which I may elect without paying the Bank a commission on any of the value of said property except commissions upon the income generated by the trust during said period."

Fred O. Johnson died on February 26, 1983, at the age of sixty-eight. The F & M Bank qualified as Executor of the Johnson Estate on March 4, 1983. When an appraisement was filed on October 20, 1983, the probate estate was valued at $158,524.40, while the trust assets had a purported value of $1,377,039.86. A 1982 Eagle automobile was valued at $7,250.

---

three shares of Rosedale Coal Company stock at the stated price.

**2.** The initial trust corpus also included 150 shares of Allegheny Power Systems, 163 shares of United States Steel Corporation, and 250 shares of Garrett Land and Minerals Company. Before his death, Mr. Johnson transferred additional cash and liquid assets in excess of $70,000 to the trust.

On October 14, 1983, pursuant to W.Va. Code § 42–3–1 (1982),[3] Dorothy Marie Johnson renounced her husband's will, under which she was entitled to receive tangible personal property valued at $12,750 and jointly owned assets valued at $7,250. She filed this lawsuit on February 24, 1984, seeking to set aside the inter vivos trust as an illusory transfer or as a consummated fraud upon her rights as the surviving widow.

Following completion of the discovery process, both the plaintiff, Dorothy Marie Johnson, and the defendants (the trust beneficiaries, F & M Bank, and Ora Lee J. Kirk and Rosedale Coal Company) made Motions for Summary Judgment. Mrs. Johnson's motion was granted on July 28, 1986, when the Circuit Court of Monongalia County held there was no genuine issue of material fact as to whether the Fred O. Johnson trust was illusory.[4] The court found that because Mr. Johnson retained such extensive control over the assets he placed in the trust during his lifetime, the inter vivos transfer was testamentary in nature, with his control over or ownership of those assets terminating only upon his death.

The appellants now appeal the July 28, 1986 order granting summary judgment for Dorothy Marie Johnson.

## I.

As is common in a majority of the states,[5] West Virginia permits a surviving spouse to elect to take a statutory share of a decedent spouse's total probate estate in lieu of any testamentary provision which may or may not have been made for that spouse. West Virginia Code § 42–3–1 (1982) reflects this legislative and public policy which attempts to protect a surviving spouse against the possibility of disinheritance.[6] However, there are numerous nonprobate devices which can be used to circumvent policy and thus diminish a surviving spouse's elective share, one of which is the inter vivos trust.

■ Courts have long recognized the right of a married person to deplete his or her estate even when the sole intent is to defeat the subsequent claim of a spouse. As long as the depletion is accomplished

---

**3.** West Virginia Code § 42–3–1 (1982) provides, in part:

When any provision is made in a will for the surviving wife or husband of the testator, such surviving wife or husband may, within eight months from the time of the admission of the will to probate, renounce such provision.... If such renunciation be made, or if no provision be made for such surviving wife or husband, such surviving wife or husband shall have such share in the real and personal estate of the decedent as such surviving wife or husband would have taken if the decedent had died intestate leaving children; otherwise the surviving wife or husband shall have no more of the decedent's estate than is given by the will.

**4.** The plaintiff's complaint contained allegations in five counts. Summary judgment was granted for the plaintiff on Counts One through Four. In Count Five the plaintiff sought damages against F & M Bank, Ora Lee J. Kirk, individually and as an officer and director of Rosedale Coal Company, and Rosedale Coal Company for tortious interference with her rights as the surviving spouse. This complaint includes Mrs. Johnson's assertion that F & M Bank, as personal representative of her husband's estate, was dilatory in its conduct in that, among other charges: a nominal $100 bond was posted by F & M Bank when it qualified as executor even

though it was apparent that Fred O. Johnson's probate estate would be worth substantially more; the appraisement of the estate was required by law to be filed by April 27, 1983, but was not filed until October 20, 1983; and, in making the appraisement, the executor did not accurately reflect the fair market value of Fred O' Johnson's stock in a variety of closely-held corporations at his death.

The plaintiff also alleges that F & M Bank, as trustee, breached its fiduciary duty by engaging in courses of conduct detrimental to her. For example, Mrs. Johnson charges that all or a substantial portion of the assets of two of the closely-held corporations, Mountaineer Farms, Inc. and Steel Supply Company, Inc., were sold at "bargain prices at substantially less than their fair market value" following her husband's death.

The circuit court found that genuine issues of material fact existed as to these and other allegations contained in Count Five and denied the defendant's motion for summary judgment.

**5.** For these statutes, see IIA Scott and Fratcher, *The Law of Trusts* § 146A (1988).

**6.** *See generally,* Fisher, *Spousal Property Rights—'Til Death Do They Part,* 90 W.Va.L.Rev. 1169, 1180 (1988).

through complete transfers of the property which comprises the estate, an inter vivos transfer is ordinarily found to be valid. *See, e.g., Johnson v. La Grange State Bank,* 73 Ill.2d 342, 22 Ill.Dec. 709, 716, 383 N.E.2d 185, 192 (1978); *Staples v. King,* 433 A.2d 407, 409–10 (Me.1981); Annot., 39 A.L.R.3d 14 (1971). However, if the transferor retains substantial control over the property during his lifetime, an otherwise valid inter vivos transfer may be considered incomplete as to the surviving spouse and be ineffective against the claim of a surviving spouse who, as a result of the transfer, will receive less than his or her legal share of the estate. Thus, inter vivos transfers may be found to be illusory or testamentary when they diminish the probate estate to the extent that there is nothing left for the surviving spouse to elect against while allowing the transferor to retain dominion and control over the assets placed in trust. *See* IA Scott and Fratcher, *The Law of Trusts* § 57.5 (1988).

Much of the confusion in this sometimes complicated area of the law arises from the use by different courts of words and phrases such as "illusory," "colorable," "retention of control," and "intent to defraud" without defining them or the context in which they are attempting to apply them.[7] We will briefly discuss each of the most prevalent approaches to testing the validity of an inter vivos transfer which reduces a surviving spouse's elective share in a decedent spouse's estate because the approach adopted by this Court in *Davis* is, in essence, an amalgam of all of these tests. In addition, the plaintiff, Dorothy Marie Johnson, incorporated all of these approaches into her argument and complaint. However, we will narrow our analysis by focusing primarily on the illusory trust doctrine, as it was the finding of the circuit court below that the inter vivos trust now before us was an invalid illusory transfer.

The illusory trust doctrine was adopted by the New York Court of Appeals in *Newman v. Dore,* 275 N.Y. 371, 9 N.E.2d 966 (1937). In *Newman,* the decedent transfer-

red all of his real and personal property into trusts three days before his death, reserving for himself the income from the trusts for life as well as the power of revocation and the power to control the trustees. *Id.* 9 N.E.2d at 967. The trial court found that the decedent executed the trust agreements in order to deprive his widow of a statutory share of his estate. *Id.*

The New York Court of Appeals rejected consideration of the decedent's intent to deprive his wife of her statutory share, finding that "[m]otive or intent is an unsatisfactory test of the validity of a transfer of property." *Id.* 9 N.E.2d at 968. The court chose instead to focus on whether the decedent intended to divest himself of ownership of his property.

> Since the law gives the wife only an expectant interest in the property of her husband which becomes part of his estate, and since the law does not restrict transfers of property by the husband during his life, it would seem that the only sound test of the validity of a challenged transfer is whether it is real or illusory.... The test has been formulated in different ways, but in most jurisdictions the test applied is essentially the test of whether the husband has in good faith divested himself of ownership of his property or has made an illusory transfer.

*Id.* 9 N.E.2d at 968–69. The court then noted the amount of control the transferor reserved over the trustee and subsequently found that "[j]udged by the substance, not by the form, the testator's conveyance is illusory, intended only as a mask for the effective retention by the settlor of the property which in form he had conveyed." *Id.* 9 N.E.2d at 969.

Thus, it appears as though "illusory transfer," as the term was used in *Newman,* is synonymous with "retention of control." In contrast, a "colorable" transfer may best be defined as a transfer which appears absolute on its face but is not an actual transfer because of a secret or tacit

---

**7.** *See generally,* Note, *Estate Planning: Validity of Inter Vivos Transfers Which Reduce or Defeat the Surviving Spouse's Statutory Share in Decedent's Estate,* 32 Okla.L.Rev. 837, 851–53 (1979).

understanding between the parties indicating that they actually intended for ownership to be retained by the donor. *See* Smith, *The Present Status of "Illusory Trust"—The Doctrine on Newman v. Dore Brought Down to Date*, 44 Mich. L.Rev. 151, 153 (1945). "Whether a transfer is 'illusory' because on its face it takes back almost all it gives, or absolute on its face and 'colored' by a secret or tacit understanding, underlying each is the intent on the part of the settlor to retain ownership in the property." *Id.* at 162.

While the "illusory transfer" test examines whether the trustee had an actual intent to divest himself of ownership of property, the "intent to defraud" test, which is a minority approach, asks whether the decedent, when making the transfer which reduced or defeated the surviving spouse's share, intended to defraud the surviving spouse of his or her marital right in the estate. *See, e.g., Hanke v. Hanke,* 123 N.H. 175, 459 A.2d 246, 248 (1983); *see generally,* Note, *Estate Planning: Validity of Inter Vivos Transfers Which Reduce or Defeat the Surviving Spouse's Statutory Share in Decedent's Estate,* 32 Okla. L.Rev. 837, 838–40 (1979). However, in addition to examining the decedent's actual intent to defraud, courts have tended to rely on a number of equitable factors to aid in their determination of whether a fraud upon marital rights has occurred, including the proximity in time between the transfer and the decedent's death, the proportion of the settlor's property transferred to the trust, the absence of consideration, and the fairness to the surviving spouse if the trust is operative. In these jurisdictions, then, an intent to defraud test may look considerably more like a "balancing of the equities" approach.[8] Criticism of the "intent to defraud" test is directed primarily at the fact that intent is difficult to prove in any case, but particularly one in which the transferor is dead.

A more recent approach to ascertaining the validity of an inter vivos transfer which impairs a surviving spouse's elective share has been labelled the "present donative intent" test, discussed in *Toman v. Svoboda,* 39 Ill.App.3d 394, 349 N.E.2d 668 (1976). In order to have "present donative intent," a transferor must intend to presently make a real gift to the transferee. The court in *Toman* found:

> ... no reason why, should he wish to do so, a donor may not make a *present* donative transfer solely of the *future* fee interest in the subject matter involved. The donor thereby simply reserves for himself the present life estate in the whole subject matter of the gift...."

*Id.* 349 N.E.2d at 674. The court cautioned, however, that:

> ... where the donor does reserve to himself the life estate in the whole subject matter of the gift, the existence of his *present* intent to give now the *future* fee interest in the subject matter of the gift must be subjected to special scrutiny to make sure that his donative intent *is* present and not merely testamentary.

*Id.* At this point, the *Toman* court referred to factors previously noted in *Montgomery v. Michaels,* 54 Ill.2d 532, 301 N.E.2d 465 (1973), which may be considered as evidence of intent and thus subject to this special scrutiny:

> ... the secretive manner in which the donor acted as to the now surviving spouse; what the donor-spouse might have said to others as to his or her intent in making the apparent gift; the proximity in time between the donative transfer and the donor's death; the value of the donor's estate and the value of property otherwise left by him or her to the surviving spouse; 'and generally, all factors which might be indicative of an intent to defraud the surviving spouse of his or her statutory share.'

---

8. "Some courts have dealt with attacks upon inter vivos dispositions by a surviving spouse in terms of the decedent's intent—that is, whether he intended to defeat or circumvent his spouse's claims upon his property. The difficulties in applying such a test have in some places virtually transformed it into one that assesses the fairness of an inter vivos disposition in the light of a variety of attending circumstances." Browder, *Giving or Leaving—What Is A Will?*, 75 Mich.L.Rev. 845, 877 (1977).

*Id.* 349 N.E.2d at 673. These are essentially the same equitable factors which may be relevant to intent when applying the "intent to defraud" test. The influence of the illusory trust doctrine is also evident in the present donative intent test. Like the illusory trust doctrine, the present donative intent test focuses upon "real" gifts, which must be made without an improper retention of control by the donor that could render an otherwise valid inter vivos transfer "quasi-testamentary" and justify a claim upon the property by a surviving spouse. *Id.* 349 N.E.2d at 677.

■ It appears that all of these tests overlap to varying degrees.[9] The only certainty emerging from these cases, as we recognized in our leading case, is that "[n]o single standard can be applied to test the validity of an inter vivos trust attacked by the settlor's spouse as a fraud upon his or her marital rights. Rather, the issue is to be decided on a case by case basis, in light of the particular facts and circumstances." Syl. pt. 8, *Davis v. K B & T Co.*, 172 W.Va. 546, 309 S.E.2d 45 (1983). Having briefly discussed the illusory transfer/retention of control test, the intent to defraud test, and the present donative intent test, we will now discuss the test adopted by this Court in *Davis* and its application to the facts of the case before us.

## II.

In *Davis*, David Farley created a revocable inter vivos trust in 1976 which had the effect of depriving his surviving widow of property she would have received under a will he executed in 1973. 172 W.Va. at 546, 309 S.E.2d at 45. In adopting its flexible standard and upholding the validity of the inter vivos trust, this Court emphasized Mr. Farley's reasons for creating the trust, thus focusing on his purpose or intent.

Mr. Farley and his wife each had sizeable estates and both were in poor health when the trust agreement was executed. Mrs.

Farley was hospitalized after suffering a complete mental breakdown, and Mr. Farley had suffered several heart attacks since his wife's hospitalization. This Court found that Mr. Farley created the trust in order to provide for both himself and his wife in the event they became incapacitated, and not with an intent to deprive Mrs. Farley of her marital rights. "The ultimate effect of the circuit court's ruling [that the property transferred to the inter vivos trust is not part of Mr. Farley's probate estate] is consistent with Mr. Farley's intent, apparent on the face of the 1976 trust agreement and will, that his estate should go to his side of the family and his wife's estate should go to her side of the family." *Id.* 172 W.Va. at 553, 309 S.E.2d at 51. Finding this intent to be entitled to "great weight," we concluded that "the intended distribution of property pursuant to the 1976 trust agreement and will is an equitable result under the facts and circumstances of this case." *Id.*

■ Turning to the facts now before us, the circuit court's decision to grant summary judgment for Dorothy Marie Johnson was also based upon a balancing of the equities in the case, the "flexible standard" adopted in *Davis* which "takes into account all of the circumstances and weighs the equities on each side." *Id.* 172 W.Va. at 552, 309 S.E.2d at 50. Under this approach, a court can consider the effect and validity of the inter vivos transfer by examining both the amount of control the settlor retains over trust assets and whether the transfer of property into a trust constituted a fraud on the rights of the surviving spouse, while also weighing any equitable factors which may or may not be relevant in a given case.

In its decision below, the circuit court noted that Mrs. Johnson has a very modest estate in her own right, which includes an undivided one-half interest in the family residence,[10] and that she was totally un-

**9.** *See generally* Browder, *Giving or Leaving— What Is A Will?*, 75 Mich.L.Rev. 845, 880 (1977), in which the author finds that "[t]he state of the authorities generally must be described as chaotic."

**10.** The record indicates that on February 14, 1984, Mrs. Johnson received a letter from Delbert R. Baker, Vice President and Trust Officer of F & M Bank, informing her that Clyde and Jerry Johnson wished to sell their undivided one-half interest in this residence because they

aware of the creation of the trust and her husband's estate planning arrangements until some time after his death. However, in finding the trust illusory or testamentary as to Mrs. Johnson, the court emphasized the beneficial ownership and control Mr. Johnson retained over the trust assets until his death. The court found that while it appeared as though Mr. Johnson's Trust Agreement created a bona fide inter vivos trust, the transfer of assets to the trust was illusory because Mr. Johnson retained virtually exclusive control over the assets. In his order, Judge Larry Starcher stated that "[W]ith the execution of the Letter Agreement, which was a condition precedent to the execution of the Trust Agreement, he took back virtually all that he [Mr. Johnson] gave under the Trust Agreement. This Court will not allow form to prevail over substance."

Several sentences in the letter agreement support the circuit court's conclusion that F & M Bank's agreement to Mr. Johnson's terms was a condition precedent to his actual execution of a Trust Agreement with F & M Bank as trustee. In the letter agreement, Mr. Johnson stated that *"Based upon the above agreement* I have executed a Trust Agreement this day naming the Farmers and Merchants' Bank as Trustee." (Emphasis added.) After delineating how he wanted his assets to be liquidated in order to fund the trust, he closed the letter by stating:

> If you find that the above properly states our agreement concerning my right to control the assets of the trust during my lifetime and if the Bank as Trustee is willing to accept the trust under the provisions set forth concerning the funding of Fund A under the Trust Agreement, I would appreciate it if you would date and sign the enclosed copy of this letter so that I may place it with my trust file.

While it is true, as the appellants argue, that the trust was created only when the Trust Agreement was signed, the terms contained in the letter agreement indicate that it constituted a separate agreement which was negotiated in advance of the execution of the Trust Agreement.

The deposition testimony of Mr. Johnson's attorney, Mr. Farmer, further strengthens this conclusion. The following is an exchange between Mr. Farmer and the plaintiff's counsel, Mr. Byrd, as they discussed the execution of the letter agreement:

Farmer: That's the reason we had the letter. If he placed stock into the trust, he had no further control over the stock so long as it was in the trust. The trustee had the right to manage and control that stock. However, the letter provides that he has a right to remove it without paying a commission so that he may then exercise any control over it that he elects to do so after it's removed.

Byrd: So your understanding of that letter, then, is that at his pleasure, that he could take any asset out of that trust on simple notification to the trustee?

Farmer: That is correct, without paying a commission.

Byrd: So if—the day after the trust was funded, he could have walked into the bank and said, "Here, give me the shares of Mountaineer Farms. I'm going to do something with them"?

Farmer: That is correct. As long as he'd give them a writing to take it out, he could take it out without paying a commission on it. He could, likewise, revoke the trust or amend the trust at any time, by writing.

Byrd: And that power that he exercised, or had the right to exercise, over those assets related to all assets of the trust?

Farmer: That's correct.

Byrd: So as I recall, there were a number of CDs or Money Market Certificates that were placed in trust. He could have done the same thing with those assets as with the stock in the closely-held companies?

Farmer: That's correct, without paying a commission. That's the reason he wrote

---

felt this real estate should be producing income for their benefit. Mrs. Johnson was told that if she did not agree to sell this property she would be charged a "monthly rental fee of $500.00 per month starting with April 1, 1983."

the letter. He wanted to get that clarified.

As we stated in *Davis*, "[t]he retention by the settlor of the power to revoke or modify a trust is insufficient, standing alone, to render the trust illusory or testamentary." Syl. pt. 7, 172 W.Va. at 549, 309 S.E.2d at 46. In this case, Mr. Johnson retained control over his trust which was considerably more extensive than simply the power to revoke or modify. In fact, it is obvious that Mr. Johnson took particular care to ensure his ability to control various aspects of the administration of this trust, as well as to retain control over the assets placed in trust. However, our decision here will not rest on this consideration alone. In order to determine whether this retention of control renders the trust illusory, as the circuit court found, we believe the more relevant inquiry in this case is whether Mr. Johnson actually intended to divest himself of his property or whether his only reason for creating the trust was to cover up the fact that he was retaining full control over his property.

In his deposition testimony, the decedent's attorney, Mr. Farmer, stated that he had advised Mr. Johnson and Mr. Johnson was aware that the transfer of his assets into an inter vivos trust would place those assets beyond the reach of his wife's election should she survive him and elect to take against his will. Mr. Farmer stated that Mr. Johnson's main concern and his intention when he created the trust was to provide for the management of his assets should he become infirm. His second concern, according to Mr. Farmer, was to provide for his wife "an amount of money which would provide a proper basis for her needs" in the event of his death and to preserve his estate for his sons.

■ The appellants argue that an intent to defraud Mrs. Johnson of her statutory right of election cannot be presumed from Mr. Johnson's creation of the inter vivos trust. In *Davis*, we noted that:

[c]ourts from other jurisdictions which have considered the validity of an inter vivos trust, attacked as a fraud upon the rights of a spouse, have generally recognized 'that the settlor's intention or purpose to deprive his or her spouse of a distributive share or other statutory right in the property transferred is not, in and of itself, sufficient to establish a fraudulent intent on the settlor's part....'

*Id.* 172 W.Va. at 552, 309 S.E.2d at 50 (citing Annot., 39 A.L.R.3d 14, 19 (1971)). In the context of this case, this simply means that we will not presume fraudulent intent on Mr. Johnson's part just because he may have wanted his wife to have less of his estate than the law would choose to give her. However, it is not necessary for this Court to presume that Mr. Johnson acted with the intent to defraud his wife of her elective share in order to invalidate the trust. As we stated above, we need only to find that Mr. Johnson did not divest himself of ownership of the trust property in good faith and, therefore, at least to his wife, his inter vivos transfer was illusory.

■ The evidence indicates that although Mr. Johnson transferred substantially all of his assets into the inter vivos trust, he did not part with the incidents of ownership. Instead, Mr. Johnson was free to manage his business interests just as he had always done. In fact, the trust assets were his to do with what he pleased, without penalty, until his death, when the Trust Agreement specified that certain assets would be liquidated in order to fund the trusts for Mrs. Johnson and Mr. Johnson's sons, Jerry and Clyde.

When questioned about the Trust Agreement, the Letter Agreement, and Mr. Johnson's apparent retention of control over trust assets, Delbert R. Baker, the Vice President and a Trust Officer of F & M Bank, stated in deposition testimony that Mr. Johnson "had reasons for retaining control over these investments such as he was on the Board of Directors at different corporations; and so, therefore, he retained control over them." Later, when he was again being questioned by the plaintiff's attorney, Mr. Byrd, he was asked about his own responsibilities as trustee.

Mr. Byrd: Mr. Baker, we touched on this issue this morning; and I'm directing

this question in regard to your capacity as Trustee of the Fred O. Johnson trust. And I would like to know specifically what duties you or the Trust Department at Farmers' and Merchants' Bank performed during his lifetime from March 25, 1982 to February 26, 1983. What duties did you perform in regard to the stock of Rosedale Coal Company, the stock of Mountaineer Farms, the stock of Steel Supply?

Mr. Baker: We performed no duties concerning those three (3) companies because they were closely-held corporations and Mr. Johnson was involved with those corporations.

Mr. Byrd: And nothing else?

Mr. Baker: We had no authority to do anything else.

Although the trustee had no authority, Mr. Johnson's own control extended so far as to allow him to attempt to negotiate the sale of the trust's single largest asset, Mountaineer Farms, Inc., without the trustee's participation or even their knowledge. Had he been successful in negotiating the sale, the terms of the letter agreement assured him that he would not have to pay the bank the commission it normally requires when assets are removed from such trusts. Mr. Johnson was able to enjoy the benefits of his trust arrangement without any apparent constraints or burdens.

It thus appears to this Court, as it did to the circuit court below, that Mr. Johnson retained such a large interest in his property that, at least to his wife, his inter vivos transfer was illusory. In other words, Mr. Johnson transferred virtually all of his property into an inter vivos trust with full knowledge of the fact that such a transfer would substantially diminish the share of his estate that his wife could receive upon his death should she renounce his will in favor of receiving her statutory elective share. The inter vivos trust functioned as a nonprobate device through which Mr. Johnson could retain control over his assets while circumventing the public policy behind our elective share statute, W.Va.Code § 42-3-1 (1982). Therefore, we conclude that, given the particular circumstances of this case, an equitable result requires that Mrs. Johnson receive her elective share of the assets her husband transferred into the inter vivos trust, as they should now be included as part of his probate estate.

### III.

The appellants argue that because Mrs. Johnson refused to renounce her interest in the trust and has continued to receive and accept its benefits, she should be barred from recovery in this proceeding. In support of their argument the appellants rely primarily on *Barnett National Bank of Jacksonville v. M.J. Murrey*, 49 So.2d 535 (Fla.1950), in which the Supreme Court of Florida held that an answer alleging that the plaintiff had not renounced or disclaimed any beneficial interest under the trust instrument constituted a defense to the action. *Id.* at 538; *see also* Annot., 21 A.L.R.2d 1457 (1952).

The *Barnett* court listed three reasons for requiring a beneficiary to either renounce a beneficial interest or promptly return the benefits received: (1) to protect the trustee if the trust should be held invalid; (2) to demonstrate the contestant's sincerity and prove that his suit was not merely vexatious, since in a proper case the property may be held as security for costs; and (3) to make the trust property readily available for disposition under court decree, free from third-party claims or demands which might attach if it remained the property of the contestant during litigation. 49 So.2d at 537.

We do not find the concerns which underlie the court's reasoning in *Barnett* to be present in this case. In the *Barnett* decision, the court went on to say that by renouncing a right to property as a condition to contesting the validity of an instrument, the beneficiary does not forfeit all rights in the property regardless of the outcome of the litigation, but may take under the instrument if efforts to vitiate the instrument are unsuccessful. *Id.* at 537–38. There are, in fact "a number of limitations upon the general rule of estoppel by the acceptance of benefits ... The rule must be applied to do equity and must

not be applied in such a manner as to violate the principles of right and good conscience.... One cannot be estopped by reason of accepting that which he is legally entitled to receive in any event." 28 Am. Jur.2d *Estoppel and Waiver* § 60 (1966). Regardless of the outcome of this litigation, Mrs. Johnson is entitled, at the very least, to the amount of money her husband provided for her under the trust instrument. Her continued receipt of income from the trust has not prejudiced the rights of its other beneficiaries. Because we have decided to affirm the circuit court's finding that the trust was illusory as to Mrs. Johnson, she is now entitled to receive her elective share of what previously were the nonprobate trust assets.

The extent to which Mrs. Johnson's interests may have been prejudiced by the sale of certain assets following Mr. Johnson's death remains to be settled.[11] However, given the facts now before us, we can see no reason why the amount Mrs. Johnson has already received under the trust should not simply be considered a setoff against the elective share of her husband's probate estate that she is now entitled to receive.[12]

### IV.

Implicit in our finding that the Fred O. Johnson Trust Agreement was illusory as to his wife is our conclusion that Mrs. Johnson was entitled to summary judgment as a matter of law with respect to the issues she raised in the first four causes of action in her complaint.

Rule 56(c) of the West Virginia Rules of Civil Procedure provides, in part, that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The guidelines to be followed when considering a motion for summary judgment

were discussed by this Court in *Aetna Casualty and Surety Company v. Federal Insurance Company of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). In syllabus point 3 we stated that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."

In this case, the circuit court granted summary judgment for Mrs. Johnson only after hearing the arguments of counsel and reviewing an extensive record consisting of pleadings, depositions, and written discovery, which we find to have adequately developed the relevant facts necessary to render a decision on the summary judgment motion. While the application of law to facts may be complicated or even difficult at times, this is not a bar to a summary judgment. "Resolution of the legal issues is for the court, and will not be rendered easier by going through the futile motions of a trial when there is no issue of fact to be tried." J. Moore, *Federal Practice* § 56.16 (1988).

We conclude that the circuit court correctly granted summary judgment in this case, as there was no genuine issue of material fact requiring exploration at trial. The issue before the court—whether the trust was illusory and/or a fraud upon Mrs. Johnson's marital rights—was one which could be decided by examining the disputed documents and reviewing the record, and, therefore, in this case, a trial was unnecessary.

Accordingly, we affirm the circuit court's granting of summary judgment on Counts One through Four of Dorothy Marie Johnson's complaint.

Affirmed.

McGRAW, J., participated and concurred in this decision but departed from the Court prior to the preparation of the opinion.

---

**11.** The substance of this pending litigation involving breach of fiduciary duty and interference with Mrs. Johnson's marital rights was discussed briefly in footnote 4.

**12.** According to the brief submitted by F & M Bank, Mrs. Johnson's monthly income from the trust is $2,000.00.

WORKMAN, J., did not participate in the consideration or decision of this case.