PERRY, J.
Joseph Franks sought medical treatment from Dr. Gary John Bowers and North Florida Surgeons, P.A. (NFS). Subsequently, Joseph suffered a large re-troperitoneal hematoma at the operative site due to the external iliac vein being lacerated during surgery. He remained hospitalized until his death. Joseph’s wife, Donna Franks, filed a complaint against Bowers and NFS for medical malpractice resulting in wrongful death. Bowers and NFS moved to compel arbitration based on the Financial Agreement signed by Joseph prior to his surgery. The trial court entered the order, compelling arbitration, “with substantial reservations,” and the First District Court of Appeal affirmed on appeal. Donna Franks, as personal representative of the Estate of Joseph Franks, seeks review of Franks v. Bowers, 62 So.3d 16 (Fla. 1st DCA 2011), on the ground that it expressly and directly conflicts with this Court’s decision in University of Miami v. Echarte, 618 So.2d 189 (Fla.1993). We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.
Franks alleges that the Financial Agreement is void under the public policy enunciated in chapter 766, Florida Statutes (2008), because the agreement does not provide the same remedies as provided by the Legislature. Because we find that the damages clause of the arbitration provision of the Financial Agreement violates the public policy pronounced by the Legislature in the Medical Malpractice Act (MMA), and we further find that the offen *1242 sive clause is not severable from the remainder of the arbitration provision, we quash the decision below compelling arbitration under the agreement with direction for the court to proceed under the guidelines provided in chapter 766, Florida Statutes.
STATEMENT OF THE CASE AND FACTS
On September 25, 2008, Joseph sought medical treatment from Dr. Bowers and NFS. Joseph signed the Financial Agreement prior to his visit. The Financial Agreement was four pages long and included a signature line on the first, third, and fourth pages. The second page included the following provision:
It is further understood, that in the event of any controversy or dispute, which might arise between the Doctor and the Patient, regardless of whether the dispute concerns the medical care rendered, including any negligence claim relating to the diagnosis, treatment, or care of the Patient, or payment of surgical fees, or any other matter whatsoever, then the parties agree that the dispute shall be resolved by arbitration as provided by the Florida Arbitration Code, Chapter 682 (Florida Statutes). This arbitration shall be in lieu and instead of any trial by Judge or Jury. Each party shall choose one arbitrator and the two arbitrators shall choose a third arbitrator. The panel of arbitrators shall hear and decide the controversy, and the decision shall be binding on all parties and may be enforced by a court of law if necessary.
In the event that either party to this Doctor-Patient Agreement refuses to go forward with arbitration, the party compelling arbitration reserves the right to proceed with arbitration, the appointment of the arbitrator, and hearing to resolve the dispute, despite the refusal to participate or the absence of the opposing party. The arbitrator shall go forward with the arbitration hearing and render a binding decision without the participation of the party opposing arbitration or despite his or her absence at the arbitration hearing.
Prior to commencing any action under this Doctor-Patient Agreement, Patient must comply with the presuit notice and investigation requirements of Chapter 766, Florida Statutes.
The Patient understands that the Patient has a constitutional right under Article I, Section 21 of the Florida Constitution of Access to Courts as follows: “The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay.” The Patient understands and acknowledges that signing this Doctor-Patient Agreement waives this constitutional right.
Within the same section, this page contains a subheading titled “Limitation of Damages,” which provides:
Patient agrees that in the event of any dispute with Doctor, for any reason whatsoever, including any negligence claim relating to the diagnosis, treatment, or care of the Patient, Patient’s non-economic damages (including, but not limited to, damages for pain and suffering) shall be limited to a maximum of $250,000 per incident, and shall be calculated on a percentage basis with respect to capacity to enjoy life, pursuant to the formula contained in Florida Statutes, Section 766.207. For example, if the Patient’s injuries resulted in a 50% reduction in his or her capacity to enjoy life, this would warrant an award of not more than $125,000 in non-economic damages. This limit applies regardless *1243 of the number of claimants or defendants in the arbitration proceeding.
This limitation of damages provision does not limit or restrict in any way the Patient’s right to seek all economic damages actually incurred by the Patient, including any medical expenses and lost wages.
On January 23, 2009, Dr. Bowers performed surgery on Joseph without reported complications. Joseph was discharged to his home. On January 25, 2009, Joseph developed pain and he and Donna went to the emergency room. A CT scan revealed a large retroperitoneal hematoma from the operative site due to the external iliac vein being lacerated during surgery. Joseph remained hospitalized until his death on February 3, 2009.
Donna Franks filed a complaint alleging medical malpractice and wrongful death. NFS filed a motion to compel arbitration, which was granted. Franks appealed the order compelling arbitration, arguing that the trial court misconstrued the agreement or that it was otherwise void as being contrary to public policy and unconscionable. Franks, 62 So.3d at 17. The First District Court of Appeal disagreed and held that “the court properly construed and applied the arbitration clause.” Id. Furthermore, the First District held,
The differences between the arbitration process in Chapter 766 and arbitration under the Financial Agreement in the present case do not countermand the public policy reflected in Chapter 766, as applied to the claims presented in this case. Unlike the nursing home cases, the Financial Agreement does not eliminate statutory rights which are essential in effectuating legislative intent, or policy. Instead, the arbitration clause, as applied in this instance, affords meaningful relief and is consistent with the legislative purpose and the public policy which led to the enactment of the medical negligence provisions in Chapter 766.
Id. at 18. Lastly, the First District found that Franks failed to demonstrate either procedural or substantive unconscionability. Id. We disagree with the district court’s conclusion that the agreement is consistent with the legislative purpose and public policy contained within chapter 766, and hold that the Limitation of Damages provision contravenes the public policy enunciated therein. We therefore quash the First District’s decision and remand for proceedings consistent with this decision.
DISCUSSION
The MMA provides, in relevant part:
(1) Voluntary binding arbitration pursuant to this section and ss.766.208-766.212 shall not apply to rights of action involving the state or its agencies or subdivisions, or the officers, employees, or agents thereof, pursuant to s.768.28.
(2) Upon the completion of presuit investigation with preliminary reasonable grounds for a medical negligence claim intact, the parties may elect to have damages determined by an arbitration panel. Such election may be initiated by either party by serving a request for voluntary binding arbitration of damages within 90 days after service of the claimant’s notice of intent to initiate litigation upon the defendant. The eviden-tiary standards for voluntary binding arbitration of medical negligence claims shall be as provided in ss. 120.569(2)(g) and 120.57(l)(c).
(3) Upon receipt of a party’s request for such arbitration, the opposing party may accept the offer of voluntary binding arbitration within 30 days....
[[Image here]]
(7) Arbitration pursuant to this section shall preclude recourse to any other *1244 remedy by the claimant against any participating defendant, and shall be undertaken with the understanding that damages shall be awarded as provided by general law, including the Wrongful Death Act, subject to the following limitations:
(a) Net economic damages shall be awardable, including, but not limited to, past and future medical expenses and 80 percent of wage loss and loss of earning capacity, offset by any collateral source payments.
(b) Noneconomic damages shall be limited to a maximum of $250,000 per incident, and shall be calculated on a percentage basis with respect to capacity to enjoy life, so that a finding that the claimant’s injuries resulted in a 50-per-cent reduction in his or her capacity to enjoy life would warrant an award of not more than $125,000 noneconomic damages.
(c) Damages for future economic losses shall be awarded to be paid by periodic payments pursuant to s.766.202(9) and shall be offset by future collateral source payments.
(d) Punitive damages shall not be awarded.
(e) The defendant shall be responsible for the payment of interest on all accrued damages with respect to which interest would be awarded at trial.
(f) The defendant shall pay the claimant’s reasonable attorney’s fees and costs, as determined by the arbitration panel, but in no event more than 15 percent of the award, reduced to present value.
(g) The defendant shall pay all the costs of the arbitration proceeding and the fees of all the arbitrators other than the administrative law judge.
(h) Each defendant who submits to arbitration under this section shall be jointly and severally liable for all damages assessed pursuant to this section.
(i) The defendant’s obligation to pay the claimant’s damages shall be for the purpose of arbitration under this section only. A defendant’s or claimant’s offer to arbitrate shall not be used in evidence or in argument during any subsequent litigation of the claim following the rejection thereof.
(j) The fact of making or accepting an offer to arbitrate shall not be admissible as evidence of liability in any collateral or subsequent proceeding on the claim.
(k) Any offer by a claimant to arbitrate must be made to each defendant against whom the claimant has made a claim. Any offer by a defendant to arbitrate must be made to each claimant who has joined in the notice of intent to initiate litigation, as provided in s.766.106. A defendant who rejects a claimant’s offer to arbitrate shall be subject to the provisions of s.766.209(3). A claimant who rejects a defendant’s offer to arbitrate shall be subject to the provisions of s.766.209(4).
(l) The hearing shall be conducted by all of the arbitrators, but a majority may determine any question of fact and render a final decision. The chief arbitrator shall decide all evidentiary matters.
The provisions of this subsection shall not preclude settlement at any time by mutual agreement of the parties.
§ 766.207(1)-(3), (7), Fla. Stat. (2008).
(1) A proceeding for voluntary binding arbitration is an alternative to jury trial and shall not supersede the right of any party to a jury trial.
(2) If neither party requests or agrees to voluntary binding arbitration, the claim shall proceed to trial or to any available legal alternative such as offer of and demand for judgment under *1245 s.768.79 or offer of settlement under s. 45.061.
(8) If the defendant refuses a claimant’s offer of voluntary binding arbitration:
(a) The claim shall proceed to trial, and the claimant, upon proving medical negligence, shall be entitled to recover damages subject to the limitations in s.766.118, prejudgment interest, and reasonable attorney’s fees up to 25 percent of the award reduced to present value.
(b) The claimant’s award at trial shall be reduced by any damages recovered by the claimant from arbitrating code-fendants following arbitration.
(4) If the claimant rejects a defendant’s offer to enter voluntary binding arbitration:
(a) The damages awardable at trial shall be limited to net economic damages, plus noneconomic damages not to exceed $350,000 per incident. The Legislature expressly finds that such conditional limit on noneconomic damages is warranted by the claimant’s refusal to accept arbitration, and represents an appropriate balance between the interests of all patients who ultimately pay for medical negligence losses and the interests of those patients who are injured as a result of medical negligence.
(b) Net economic damages reduced to present value shall be awardable, including, but not limited to, past and future medical expenses and 80 percent of wage loss and loss of earning capacity, offset by any collateral source payments.
(c) Damages for future economic losses shall be awarded to be paid by periodic payments pursuant to s.766.202(9), and shall be offset by future collateral source payments.
(5) Jury trial shall proceed in accordance with existing principles of law.
§ 766.209, Fla. Stat. (2008). We previously discussed, in depth, the intent and purpose of these provisions, stating:
The Legislature enacted the statutory scheme at issue following the recommendations and study made by the Academic Task Force for Review of the Insurance and Tort Systems (Task Force). In studying medical malpractice insurance costs, the Task Force found that the
primary cause of increased malpractice premiums has been the substantial increase in loss payments to claimants and not excessive insurance company profits nor the insurance industry underwriting cycle. Further, the Task Force found that the dramatic increase in the size or amounts of paid claims was the major cause of the increase in total claims payments; the frequency of claims against physicians increased only slightly. In particular, the size and increasing frequency of the very large claims were found to be a problem. Finally, attorneys’ fees and other litigations costs were found to represent approximately 40 percent of the total costs of insurance companies, while claimants received 43.1 percent of the insurers’ total incurred costs. During the past eleven years, the average cost of defending a malpractice claim had increased at an annual compound rate of seventeen percent.
Academic Task Force for Review of the Insurance and Tort Systems, Medical Malpractice Recommendations at 10-11 (Nov. 6,1987) (footnotes omitted) (on file with ELR.Comm. on Ins., The Capitol). The Task Force recommended implementation of a medical malpractice plan designed to stabilize and reduce medical liability premiums. The recommended plan included that parties conduct a reasonable investigation preceding malprac *1246 tice claims and defenses in order to eliminate frivolous claims and defenses, and incentives for parties to arbitrate medical malpractice claims in order to reduce litigation expenses. The Legislature adopted the Task Force’s recommendations and findings in chapter 88-1, Laws of Florida, and section 766.201, Florida Statutes (Supp.1988).
Echarte, 618 So.2d at 191-92 (footnotes omitted). We explained why the Legislature rejected a no-fault system similar to the one adopted by the Financial Agreement, stating:
[Mjedical malpractice arbitration statutes are less restrictive than the workers’ compensation statutes, and ... the Task Force specifically considered and rejected both a no-fault alternative system of compensation and a mandatory insurance pool as means to control increases in the medical malpractice insurance rates.
Echarte, 618 So.2d at 194.
Furthermore, in considering a no-fault system, the Task Force stated that for most medical injuries
the Task Force does not recommend a no-fault compensation alternative to the tort system. This negative conclusion is compelled by findings that a comprehensive no fault system for all medical injuries would be prohibitively expensive, many times more expensive than the existing medical malpractice systems. In order to develop a no-fault system at reasonable cost, it is necessary to establish a framework for distinguishing compensable events from noncompensable events. In most areas of medical injury, this is not economically feasible at the present time. For example, defining the compensable event for a no-fault plan to cover medical injuries in emergency rooms and trauma centers would require terms broad enough to include injuries of every degree to any part of the body resulting from an unlimited variety of medical interventions. Because of its expansive potential, such a broad definition of the compensable event would make no-fault insurance costs prohibitively expensive, at worst, and impossible to predict, at best.
Medical Malpractice Recommendations at 31-32. The Task Force also rejected a proposal which would require all physicians to buy into a state-operated insurance pool in order to provide a mandatory first layer of medical malpractice insurance. The Task Force explained that such a plan “could effectively destroy any existing vitality and competitiveness in the private market for medical malpractice insurance in the state of Florida.” Medical Malpractice Recommendations at 49. Further, the Task Force noted that placing all physicians in a state-operated insurance pool would have the effect of charging physicians who practice in low-risk areas of medicine higher premiums in order to subsidize the high cost of premiums for physicians who practice in high-risk areas. The Task Force specifically rejected such mandatory insurance plans as being overly intrusive into the insurance market and economically undesirable. Id.
The Task Force’s recommendations to the Legislature not to adopt a no-fault system or mandatory insurance program are based on an extensive study of the complex causes of the increases in medical malpractice insurance rates. According to the Task Force’s report the solutions the Legislature implemented to meet the workers’ compensation problem are not effective to answer the medical malpractice insurance liability crisis. The unique facts surrounding *1247 medical malpractice required the Legislature to tailor a different solution to solve the crisis.
Echarte, 618 So.2d at 194-95. Finally, relating to the purpose of the MMA, we accepted the Legislature’s statement of findings presented in the preamble of the chapter, stating:
[T]he Legislature set out its factual findings in the preamble of chapter 88-1, which initially enacted the Task Force’s recommendations. In fact, the preamble in chapter 88-1 states in part:
[I]t is the sense of the Legislature that if the present crisis is not abated, many persons who are subject to civil actions will be unable to purchase liability insurance, and many injured persons will therefore be unable to recover damages for either their economic losses or their non-economic losses....
Ch. 88-1. This preamble dearly states the Legislature’s conclusion that the current medical malpractice insurance crisis constitutes an “overpowering public necessity.” Moreover, the Legislature made a specific factual finding that “[m]edieal malpractice liability insurance premiums have increased dramatically in recent years, resulting in increased unavailability of malpractice insurance for some physicians.” § 766.201(l)(a).
The Legislature’s factual and policy findings are supported by the Task Force’s findings in its report.
Echarte, 618 So.2d at 196 (emphasis added). Accordingly, we have clarified the stated policy and intent of the Act — to address the “overpowering public necessity” created by the medical malpractice insurance crisis. And, the MMA does “redress an existing grievance.” Specifically, the MMA presents the Legislature’s careful balancing of the rights of patients and the needs of doctors in order to address the medical malpractice crisis. Further, the MMA was enacted to limit the remedies available to patients, which represents a change to the remedy available to patients.
We have said that parties are free to contract around a state law so long as there is nothing void as to public policy or statutory law. See, e.g., Green v. Life & Health of America, 704 So.2d 1386, 1390 (Fla.1998). However, a contractual provision that contravenes legislative intent in a way that is clearly injurious to the public good violates public policy and is thus unenforceable. See generally Mullis v. State Farm Mut. Auto. Ins. Co., 252 So.2d 229 (Fla.1971). We do not take lightly the freedom of contract, but we find that the Financial Agreement blatantly contravenes the intent provided by the Florida Legislature, discussed above.
We have previously stated that “[t]he arbitration provisions were enacted to provide ‘[Substantial incentives for both claimants and defendants to submit their cases to binding arbitration, thus reducing attorneys’ fees, litigation costs, and delay.’ ” Chester v. Doig, 842 So.2d 106, 107 (Fla.2003) (quoting § 766.201(2)(b), Fla. Stat. (1997)). The Financial Agreement requires the parties to submit to financial arbitration and therefore meets the first stated goal of the MMA. However, the “substantial incentives” for the claimants to submit to the arbitration have been removed under the agreement. We previously explained the incentives for claimants to voluntarily submit to such a process, stating:
The claimant benefits from the requirement that a defendant quickly determine the merit of any defenses and the extent of its liability. The claimant also saves the costs of attorney and expert witness fees which would be required to prove liability. *1248 Further, a claimant who accepts a defendant’s offer to have damages determined by an arbitration panel receives the additional benefits of: 1) the relaxed evidentiary standard for arbitration proceedings as set out by section 120.58, Florida Statutes (1989); 2) joint and several liability of multiple defendants in arbitration; 3) prompt payment of damages after the determination by the arbitration panel; 4) interest penalties against the defendant for failure to promptly pay the arbitration award; and 5) limited appellate review of the arbitration award requiring a showing of “manifest injustice.”
On the other hand, the most significant incentive for defendants to concede liability and submit the issue of damages to arbitration is the $250,000 cap on noneconomic damages. This limitation provides liability insurers with the ability to improve the predictability of the outcome of claims for the purpose of loss planning in risk assessment for premium purposes.
St. Mary’s Hosp., Inc. v. Phillipe, 769 So.2d 961, 970 (Fla.2000) (quoting Echarte, 618 So.2d at 194); see also N. Miami Med. Ctr. v. Prezeau, 793 So.2d 1142, 1144-45 (Fla. 3d DCA 2001) (“It is apparent from the clear and unambiguous language of the statute that the benefit of the statutory cap on non-eeonomic damages is solely reserved for a defendant who is conceding liability and participating in arbitration. This benefit is part of the statutory scheme to encourage the arbitration of medical negligence claims.”).
Under the statute, Franks would be entitled to receive a maximum of $1 million if the case proceeded to court without either party seeking arbitration, or if Dr. Bowers and NFS refused to proceed with arbitration under the conditions of section 766.207. See § 766.209, Fla. Stat. (2008) (providing that the caps under § 766.118, Fla. Stat. (2008), apply when voluntary arbitration is refused.); § 766.118(2)(a)-(b), Fla. Stat. (2008) (“With respect to a cause of action for ... wrongful death arising from medical negligence of practitioners, ... noneconomic damages shall not exceed $500,000 per claimant.... [I]f the negligence resulted in a ... death, the total noneconomic damages recoverable from all practitioners ... under this paragraph shall not exceed $1 million”). Under the Financial Agreement, Franks could only receive a maximum of $250,000. Further, the agreement dispenses with the inherent concession of liability provided by section 766.207. See § 766.207(2), Fla. Stat. (2008) (“[T]he parties may elect to have damages determined by an arbitration panel.”). This Court has previously stated that the concession of liability is one of the incentives provided by the chapter. See St. Mary’s Hospital, 769 So.2d at 970.
The incentive provided to claimants to encourage arbitration is a necessary provision of the MMA. We therefore find that the Financial Agreement’s avoidance of the incentive contravenes the intent of the statute and, accordingly, the public policy of this state. Because the Legislature explicitly found that the MMA was necessary to lower the costs of medical care in this State, we find that any contract that seeks to enjoy the benefits of the arbitration provisions under the statutory scheme must necessarily adopt all of its provisions.
We now turn to whether the objectionable provision is severable. NFS argues that the arbitration provision of the financial agreement is valid and that the limitation of damages provision is a separate and severable provision. We disagree. A plain reading of the agreement and its provisions provides that the Limi *1249 tation of Damages pro-vision is not severa-ble from the Arbitration provision, without which the trial court’s order compelling arbitration is void. Because we are reviewing the propriety of the order compelling arbitration, we do not address whether the arbitration provision is severable from the Financial Agreement.
We have previously set forth the following standard for determining whether a contractual provision is severable from the whole:
As to when an illegal portion of a bilateral contract may or may not be eliminated leaving the remainder of the contract in force and effect, the authorities hold generally that a contract should be treated as entire when, by a consideration of its terms, nature, and purpose, each and all of its parts appear to be interdependent and common to one another and to the consideration. Stokes v. Baars, 18 Fla. 656 [ (1882) ]; 12 Am. Jur., Contracts, sec. 316. Stated differently, a contract is indivisible where the entire fulfillment of the contract is contemplated by the parties as the basis of the arrangement. Hyde & Gleises v. Booraem & Co., 16 Pet. 169, 10 L.Ed. 925 [ (1842) ]. On the other hand, a bilateral contract is severable where the illegal portion of the contract does not go to its essence, and where, with the illegal portion eliminated, there still remains of the contract valid legal promises on one side which are wholly supported by valid legal promises on the other. Williston on Contracts, rev. ed., Vol. 6, sec. 1782.
Whether a contract is entire or divisible depends upon the intention of the parties. Ireland v. Craggs, 5 Cir. [(1932)], 56 F.2d 785. And this is a matter which may be determined “by a fair construction of the terms and provisions of the contract itself, and by the subject matter to which it has reference.” 12 Am.Jur., Contracts, sec. 315.
Local No. 234 v. Henley & Beckwith, Inc., 66 So.2d 818, 821-22 (Fla.1953). “To the extent this claim is based on written materials before this Court, the issue is a pure question of law, subject to de novo review.” Shotts v. OP Winter Haven, Inc., 86 So.3d 456, 475 (Fla.2011) (citing Aills v. Boemi, 29 So.3d 1105, 1108 (Fla.2010)).
The Financial Agreement is a four-page document containing twelve separate headings. Joseph’s signature appears on pages two, three, and four of the agreement. The Arbitration provision begins on page two and continues on page three. The Limitation of Damages clause appears as a subheading under the Arbitration provision on page two. Because of this format, it does not appear that either party intended for the Limitation of Damages provision to be separated from the Arbitration provision. A further indication of this intent is that the signature acknowledging the agreement appears on page three under “Arbitration, continued.” Additionally, the plain language of the Limitation of Damages provision supports this conclusion: “This limit applies regardless of the number of claimants or defendants in the arbitration proceeding.” Based on the foregoing, we find that the Limitation of Damages clause is not severable from the Arbitration provision of the Financial Agreement.
Lastly, we address whether the Federal Arbitration Act (FAA) precludes our finding expressed herein. Dr. Bowers argues that if the MMA is interpreted to restrict the enforcement of the arbitration clause in the financial agreement, then the FAA preempts state law. Because we find that the MMA does not preclude all arbitration — and, in fact encourages arbitration under the specified guidelines — and that our decision here is fact-specific per- *1250 taming only to the particular agreement before us and does not prohibit all arbitration agreements under the MMA, we likewise find that the FAA does not preempt state law or preclude our decision here.[1] The FAA reflects a strong federal policy favoring enforcement of agreements to arbitrate and provides, in part, that a written agreement to arbitrate disputes arising from a contract “shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.” 9 U.S.C. § 2 (2006). However, this policy does not preclude a state from enforcing its laws regarding arbitration procedures.
In Volt Information Sciences, Inc. v. Board of Trustees, 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), the United States Supreme Court held that a state statute is not preempted by the FAA where the parties have agreed that their agreement will be governed by state law. Volt, 489 U.S. at 470, 109 S.Ct. 1248. After a dispute arose between the parties, Stanford University filed an action against Volt in California Superior Court and Volt moved to compel arbitration. The Superi- or Court denied Volt’s motion to compel arbitration and stayed the proceeding pending the outcome of tangential litigation. Volt appealed to the California Court of Appeal, which affirmed, reasoning “that the purpose of the FAA was not to mandate the arbitration of all claims, but merely the enforcement of privately negotiated arbitration agreements.” Volt, 489 U.S. at 472, 109 S.Ct. 1248 (internal quotation marks omitted). The United States Supreme Court affirmed, stating:
The [FAA] was designed to overrule the judiciary’s longstanding refusal to enforce agreements to arbitrate, and place such agreements upon the same footing as other contracts. Section 2 of the Act therefore declares that a written agreement to arbitrate in any contract involving interstate commerce or a maritime transaction shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract, and § 4 allows a party to such an arbitration agreement to petition any United States district court for an order directing that such arbitration proceed in the manner provided for in such agreement.
But § 4 of the FAA does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that arbitration proceed in the manner provided for in the parties’ agreement.
Volt, 489 U.S. at 474-75, 109 S.Ct. 1248 (citations, internal quotation marks, brackets, emphasis, and ellipses omitted).
[T]he FAA does not require parties to arbitrate when they have not agreed to do so, nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement. It simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms.
Volt, 489 U.S. at 478, 109 S.Ct. 1248 (citations omitted).
But it does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself. Indeed, such a result would be quite inimical to the FAA’s primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms. Arbitration under the Act is a matter of consent, not coercion, and parties are *1251 generally free to structure their arbitration agreements as they see fit.
Volt, 489 U.S. at 479, 109 S.Ct. 1248.
In short, “[t]here is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate.” Volt, 489 U.S. at 476, 109 S.Ct. 1248. Based on this reasoning, the FAA does not preempt this Court’s determination that the arbitration provision must follow the rules outlined in chapter 766 because our conclusion does not impede the general enforceability of agreements to arbitrate.
CONCLUSION
Based on our decision above, we decline to address whether the Financial Agreement was unconscionable. For the foregoing reasons, we find that the Financial Agreement is void as to public policy and quash the First District’s decision affirming the trial court’s order compelling arbitration. We remand with instructions to hold further proceedings consistent with our decision.
It is so ordered.
PARIENTE, LEWIS, QUINCE and LABARGA, JJ., concur.
PARIENTE, J., specially concurs with an opinion.
CANADY, J., dissents with an opinion, in which POLSTON, C.J., concurs.

. See Powertel, Inc. v. Bexley, 743 So.2d 570, 573 (Fla. 1st DCA 1999); Shearson/Lehman Brothers, Inc. v. Ordonez, 497 So.2d 703 (Fla. 4th DCA 1986).