# Supreme Court of Florida

_____

No. SC15-67
_____

**EILEEN HERNANDEZ, M.D., et al.,**
Petitioners,

vs.

**LUALHATI CRESPO, et al.,**
Respondents.

[December 22, 2016]

QUINCE, J.

This case is before the Court for review of the decision of the Fifth District Court of Appeal in Crespo v. Hernandez, 151 So. 3d 495 (Fla. 5th DCA 2014). The district court certified that its decision is in direct conflict with the decision of the Second District Court of Appeal in Santiago v. Baker, 135 So. 3d 569 (Fla. 2d DCA 2014). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.

The issue presented is whether the medical malpractice arbitration agreement between Mrs. Crespo and Petitioners is void as against public policy because it excludes required provisions of the Medical Malpractice Act (MMA). We find that, as in Franks v. Bowers, the agreement in question is void and

violates public policy because it includes statutory terms only favorable to the Petitioners, thereby "contraven[ing] legislative intent in a way that is clearly injurious to the public good." 116 So. 3d 1240, 1247 (Fla. 2013). Therefore, we exercise our jurisdiction to grant the petition for review, and, in accordance with Bowers, we approve the decision below and disapprove the Second District's decision in Santiago. We decline to address whether Mr. Crespo's claims against Petitioners stand alone regardless of the viability of the medical malpractice agreement between Petitioners and Mrs. Crespo.

## I. STATEMENT OF THE CASE AND FACTS

On August 17, 2011, Mrs. Crespo was 39 weeks pregnant and having contractions. She was turned away from her doctor's appointment because she was a few minutes late, and her appointment was rescheduled for August 21. On August 20, 2011, Mrs. Crespo delivered her stillborn son, Joseph Crespo. On December 19, 2012, Mr. and Mrs. Crespo furnished Petitioners, Dr. Eileen Hernandez and Women's Care Florida, a notice to initiate litigation regarding the treatment which caused Joseph's stillbirth. On March 11, 2013, Petitioners denied the Crespos' claim. On May 23, 2013, Mr. and Mrs. Crespo filed their complaint against Petitioners.

On May 31, 2013, Petitioners filed a motion to stay proceedings and compel binding arbitration pursuant to the agreement between Mrs. Crespo and Women's Care Florida. This undated arbitration agreement provides in pertinent part:

**BY SIGNING THIS AGREEMENT YOU ARE WAIVING YOUR RIGHT TO A JURY TRIAL AND YOU ARE AGREEING TO ARBITRATE ALL CLAIMS ARISING OUT OF OR RELATED TO YOUR MEDICAL CARE AND TREATMENT**

1. **AGREEMENT TO ARBITRATE CLAIMS REGARDING FUTURE CARE & TREATMENT**. The patient agrees that any controversy, including without limitation, claims for medical malpractice, personal injury, loss of consortium, or wrongful death, arising out of or in any way relating to the diagnosis, treatment, or care of the patient by the undersigned provider of medical services, including any partners, agents, or employees of the provider of medical services, shall be submitted to binding arbitration.

2. **AGREEMENT TO ARBITRATE CLAIMS REGARDING PAST CARE AND TREATMENT**. The patient further agrees that any controversy, including without limitation, claims for medical malpractice, personal injury, loss of consortium, or wrongful death, arising out of or in any way relating to the past diagnosis, treatment, or care of the patient by a provider of medical services, or the provider's agents or employees, shall be submitted to binding arbitration.

3. **WAIVER OF RIGHT TO JURY TRIAL**. Both parties to this Agreement, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of binding arbitration.

4. **ALL CLAIMS MUST BE ARBITRATED BY ALL CLAIMANTS**. All claims based upon the same occurrence, incident, or care shall be arbitrated in one proceeding. It is the intention of the parties that this Agreement bind all parties whose claims may arise out of or relate to treatment or services provided by the provider of

medical services, including the patient, the patient's estate, any spouse or heirs of the patient, any biological or adoptive parent of the patient and any children of the patient, whether born or unborn, at the time of the occurrence giving rise to the claim. In the case of any pregnant mother, the term "patient" herein shall mean both the mother and the mother's expected child or children. By signing this Agreement, the parties consent to the participation in this arbitration of any person or entity that would otherwise be a proper additional party in a court action.

5. **ARBITRATION PROCEDURES**. The parties agree and recognize that the provisions of Florida Statutes, Chapter 766, governing medical malpractice claims shall apply to the parties and/or claimant(s) in all respects except that at the conclusion of the pre-suit screening period and provided there is no mutual agreement to arbitrate under Florida Statutes, 766.106 or 766.207, the parties and/or claimant(s) shall resolve any claim through arbitration pursuant to this Agreement. Accordingly, any demand for arbitration shall not be made until the conclusion of the pre-suit screening period under Florida Statutes, Chapter 766. Within (20) twenty days after a party to this Agreement has given written notice to the other of a demand for arbitration of said dispute or controversy, the parties to the dispute or controversy shall each have an absolute and unfettered right to appoint an arbitrator of its choice and shall give notice of such appointment to the other. Within a reasonable time after such notices have been given the two arbitrators so selected shall select a neutral arbitrator and give notice of the selection thereof to the parties. The arbitrators shall hold a hearing within a reasonable time from the date of notice of selection of the neutral arbitrator. The parties agree that the arbitration proceedings are private, not public, and the privacy of the parties and of the arbitration proceedings shall be preserved.

6. **NICA**. Nothing in this Agreement shall be construed as a waiver of any law related to Florida's Birth Related Neurological Injury Compensation Plan (Florida Statutes 766.301-766.316, hereinafter the "Plan"). If a request to submit a claim to the Plan is made by a party to this Agreement, all arbitration proceedings shall be stayed until it is determined whether the claim filed with the Plan is compensable. In accordance with the Plan, claims for "birth-related neurological injury[,"] as defined by the Plan, shall be the exclusive remedy except

that a civil action shall not be foreclosed and shall be submitted to binding arbitration in accordance with this Agreement where there is clear and convincing evidence of bad faith or malicious purpose or willful and wanton disregard of human rights, safety or property, provided that such suit is filed prior to and in lieu of payment of an award under the Plan and provided that such suit shall be filed before the award of the Division of Administrative Hearings becomes conclusive and binding.

7. **ARBITRATION EXPENSES**.  Expenses of the arbitration shall be shared equally by the parties to this Agreement.

8. **APPLICABLE LAW**.  Except as herein provided, the arbitration shall be conducted and governed by the provisions of the Florida Arbitration Code, Florida Statutes, Section 682.01 et seq. . . .  In conducting the arbitration under Florida Statutes, Section 682.01 et seq., all substantive provisions of Florida law governing medical malpractice claims and damages related thereto, including but not limited to, Florida's Wrongful Death Act, the standard of care for medical providers, caps on damages under Florida Statutes 766.118, the applicable statute of limitations and repose as well as and [sic] the application of collateral sources and setoffs shall be applied. . . .

9. **EFFECT OF REFUSAL TO PROCEED WITH ARBITRATION**.  In the event that any party to this Agreement refuses to go forward with arbitration, the party compelling arbitration reserves the right to proceed with arbitration, the appointment of an arbitrator, and hearings to resolve the dispute, despite the refusal to participate or the absence of the opposing party.  Submission of any dispute under this agreement to arbitration may only be avoided by a valid court order, indicating that the dispute is beyond the scope of this arbitration Agreement or contains an illegal aspect precluding the resolution of the dispute by arbitration.  Any party to this agreement who refuses to go forward with arbitration hereby acknowledges that the arbitrator will go forward with the arbitration hearing and render a binding decision without the participation of the party opposing arbitration or despite that party's absence at the arbitration hearing.

**BY SIGNING THIS AGREEMENT YOU ARE WAIVING YOUR RIGHT TO A JURY TRIAL AND YOU ARE**

**AGREEING TO ARBITRATE ALL CLAIMS ARISING OUT OF OR RELATED TO YOUR MEDICAL CARE AND TREATMENT**

10. **SEVERABILITY**.  If any provision of this Agreement is held invalid or unenforceable, the remaining provisions shall remain in full force and shall not be affected by the invalidity of any other provision.

11. **ACKNOWLEDGEMENTS BY PATIENT**.  The patient, by signing this agreement, also acknowledges that he or she has been informed that:

a. **NO DURESS**.  The Agreement may not be submitted to a patient for approval when the patient's condition prevents the patient from making a rational decision whether or not to agree;

b. **AGREEMENT BASED UPON OWN FREE WILL**.  The decision whether or not to sign the agreement is solely a matter for the patient's determination without any influence by the physician or hospital;

c. **BINDING ARBITRATION AND EFFECT ON RIGHT OF APPEAL**.  Binding arbitration means that the parties give up their right to go to court to assert or defend a claim covered by this Agreement.  The resolution of claims covered by this Agreement will be determined by a panel of arbitrators and not a judge or jury.  Each party is entitled to a fair hearing, but the arbitration procedures are simpler and more limited than rules applicable in court.  Arbitration decisions are as enforceable as any court order.  The decision of an arbitration panel is final and there will generally be no right to appeal an adverse decision.

d. **READ AGREEMENT, VIEWED VIDEO, AND UNDERSTOOD**.  I have read and understand the above Agreement and I have carefully viewed a video program that was presented to me that explained this Agreement to my satisfaction.  I understand that I have the right to have my questions about arbitration or this Agreement answered and I do not have any unanswered questions.  I execute this Agreement of my own free will and not under any duress.
. . .

Mrs. Crespo signed the agreement, but Mr. Crespo did not. The agreement was also signed by Robert Yelverton, M.D., Chief Medical Officer, on behalf of Women's Care Florida and as an agent of its physicians, partners, and employees.

On August 29, 2013, Mr. and Mrs. Crespo requested binding arbitration pursuant to section 766.207, Florida Statutes, which Petitioners rejected, arguing that they were enforcing the signed agreement.

## II. CERTIFIED CONFLICT CASE

The facts in Santiago, 135 So. 3d at 570, the certified conflict decision, are as follows:

> Leydiana Santiago and Armando Ocasio, the parents and natural guardians of the child, Z.O.S., sued Dr. Marisa Baker and Women's Care Florida, LLC, d/b/a Lifetime Obstetrics and Gynecology (collectively, Lifetime), for medical malpractice. Tragically, Z.O.S. suffers from severe birth defects allegedly caused by a drug that Ms. Santiago resumed taking to treat a chronic disease. According to the complaint, upon becoming a new patient at Lifetime, Ms. Santiago informed the medical staff that she and her husband were planning to have a second child. Later, an over-the-counter pregnancy test taken by Ms. Santiago yielded a positive result. On two visits several days later, however, Lifetime advised her that the pregnancy was nonviable; Lifetime recommended a dilation and curettage, which Ms. Santiago declined. Thereafter, Ms. Santiago resumed taking the drug, allegedly believing that spontaneous passage of the fetus would occur. She also alleged that she was unaware of the possible adverse effects the drug might have on a fetus.

The trial court granted Lifetime's motion to compel arbitration based on the arbitration agreement Ms. Santiago executed prior to the birth. Id. The plaintiffs

in <u>Santiago</u> did not request voluntary statutory arbitration. <u>Id.</u> The agreement provided that the parties were to share the arbitration expenses equally. <u>Id.</u> at 571. The Second District held that the arbitration agreement was not void as against public policy because the parties never invoked the statutory arbitration scheme and found that nothing in the MMA prohibited the parties from arbitrating their claims by private agreement outside of the statutory scheme. <u>Id.</u> at 571 (quoting <u>Bowers</u>, 116 So. 3d at 1248).

### III.  THE AGREEMENT IS VOID AS AGAINST PUBLIC POLICY

This Court reviews the decision of the district court on this issue de novo. <u>DFC Homes of Fla. v. Lawrence</u>, 8 So. 3d 1281, 1282-83 (Fla. 4th DCA 2009) ("An order granting or denying a motion to compel arbitration is reviewed <u>de novo</u>."). Parties may contract freely around a statute, but "a contractual provision that contravenes legislative intent in a way that is clearly injurious to the public good violates public policy and is thus unenforceable." <u>Bowers</u>, 116 So. 3d at 1247. In order to determine whether the agreement at issue violates public policy, we must first determine the intent of the Legislature in passing the MMA.

This Court has previously accepted the Legislature's statement of findings relating to the purpose of the MMA:

> [T]he Legislature set out its factual findings in the preamble of chapter 88-1, which initially enacted the [Medical Malpractice Recommendations of the Academic Task Force for Review of the

- 8 -

Insurance and Tort Systems]. In fact, the preamble in chapter 88-1 states in part:

> [I]t is the sense of the Legislature that if the present crisis is not abated, many persons who are subject to civil actions will be unable to purchase liability insurance, and many injured persons will therefore be unable to recover damages for either their economic losses or their non-economic losses. . . .

Ch. 88-1. <u>This preamble clearly states the Legislature's conclusion that the current medical malpractice insurance crisis constitutes an "overpowering public necessity.</u>" Moreover, the Legislature made a specific factual finding that "[m]edical malpractice liability insurance premiums have increased dramatically in recent years, resulting in increased unavailability of malpractice insurance for some physicians." § 766.201(1)(a).

The Legislature's factual and policy findings are supported by the Task Force's findings in its report.

<u>Id.</u> (quoting <u>Univ. of Miami v. Echarte</u>, 618 So. 2d 189, 196 (Fla. 1993)). To achieve the explicit purpose of remedying the medical malpractice insurance crisis, the Legislature specifically created the MMA statutory scheme.

While we have, subsequent to <u>Bowers</u>, questioned the existence of a continuing medical malpractice crisis in holding caps on damages in medical malpractice unconstitutional, <u>see Estate of McCall v. United States</u>, 134 So. 3d 894, 914 (Fla. 2014) (plurality opinion); <u>id.</u> at 916-17 (Pariente, J., concurring in result), the issue in this case is not whether the arbitration provision of the medical malpractice statute is unconstitutional, but whether the unilateral alteration of the arbitration provision is contrary to the public policy expressed in the MMA. The MMA statutory scheme includes, among others, the following provisions:

defendant's concession of liability;[1] neutral arbitrators including an administrative

law judge;[2] defendant's assumption of arbitration costs and attorney's fees;[3]

defendant's responsibility for payment of interest on damages;[4] joint and several

liability of defendants;[5] and the right to appeal.[6]

Parties may freely contract around state law where the provisions of such

contracts are not void as against public policy because they contravene a statute or

_____

1. § 766.207(2), Fla. Stat. (1999) ("Upon the completion of the presuit investigation with preliminary reasonable grounds for a medical negligence claim intact, the parties may elect to have damages determined by an arbitration panel"); § 766.106(3)(b), Fla. Stat. (2003) ("At or before the end of the 90 days, the prospective defendant . . . shall provide the claimant with a response: 1. Rejecting the claim; 2. Making a settlement offer; or 3. Making an offer to arbitrate in which liability is deemed admitted and arbitration will be held only on the issue of damages."). See also Bowers, 116 So. 3d at 1248 ("[T]he agreement dispenses with the inherent concession of liability provided by section 766.207."); Echarte, 618 So. 2d at 194 ("The claimant benefits from the requirement that a defendant quickly determine the merit of any defenses and the extent of its liability. The claimant also saves the costs of attorney and expert witness fees which would be required to prove liability."); St. Mary's Hosp., Inc. v. Phillipe, 769 So. 2d 961, 970 (Fla. 2000) ("[T]he most significant incentive for defendants to concede liability and submit the issue of damages to arbitration is the $250,000 cap on noneconomic damages.").

2. § 766.207(4)-(5), Fla. Stat. (1996).

3. § 766.207(7)(f)-(g), Fla. Stat. (2003).

4. § 766.207(7)(e), Fla. Stat.

5. § 766.207(7)(h), Fla. Stat.

6. § 766.212(1), Fla. Stat. (1988).

legislative intent.  See id.; Green v. Life & Health of Am., 704 So. 2d 1386, 1390 (Fla. 1998).  Contractual provisions which contravene a statute or legislative intent are injurious to the public good, violate public policy, and are therefore unenforceable.  See Bowers, 116 So. 3d at 1247; McKenzie Check Advance of Fla., LLC v. Betts, 112 So. 3d 1176, 1183 (Fla. 2013); Lacey v. Healthcare & Ret. Corp. of Am., 918 So. 2d 333, 334 (Fla. 4th DCA 2005); see generally Mullis v. State Farm Mut. Auto. Ins. Co., 252 So. 2d 229 (Fla. 1971).  Because we hold the freedom to contract in high regard, we carefully weigh the right to freely contract against the legislative intent and the public policy it seeks to enact.  See Bituminous Cas. Corp. v. Williams, 17 So. 2d 98, 101-02 (Fla. 1944).

We find that arbitration agreements which purport to incorporate the statutory scheme but have terms clearly favorable to one party, like the agreement between Mrs. Crespo and Petitioners, contravene the " 'substantial incentives for both claimants and defendants to submit their cases to binding arbitration' " which "[t]he arbitration provisions were enacted to provide." Chester v. Doig, 842 So. 2d 106, 107 (Fla. 2003) (quoting § 766.201(2)(b), Fla. Stat. (1997)).  The MMA statutory scheme was enacted with the explicit goal of "reducing attorney's fees, litigation costs, and delay" caused by terms favorable to one party like those in the agreement in this case.  § 766.201(2)(b), Fla. Stat. (1988).

The agreement between the parties tracks the statute in that it provides for patients to give up the right to a jury trial but severely limits the benefits provided in exchange for giving up that right. The agreement at issue incorporates the statutory provisions with a section recognizing that "Florida Statutes, Chapter 766, governing medical malpractice claims shall apply to the parties" in all aspects except that if there is no mutual agreement to arbitrate under sections 766.106 or 766.207 at the conclusion of the pre-suit screening period, the parties will resolve any claim through the terms of the agreement. Otherwise, the agreement between Mrs. Crespo and Petitioners only resembles the statute in that it provides for three arbitrators. The agreement also provides a method through which Petitioners can avoid arbitration under the statutory provisions altogether.

The agreement requires that the parties appoint arbitrators of their choosing within twenty days of a demand for arbitration, which favors Petitioners more than the balanced MMA statutory provision calling for independent arbitrators. The agreement does not specify whether this provision applies to demands for arbitration under Florida Statutes. Therefore, patients subject to this agreement but seeking arbitration under the statutes would have to secure the "mutual agreement to arbitrate under Florida Statutes, 766.106 or 766.207" within this twenty-day window in order to escape the unfavorable terms. This arrangement leaves the power to force arbitration under the agreement in the hands of Petitioners, who can

- 12 -

simply withhold consent to arbitrate under the Florida Statutes for the twenty-day period after a demand for arbitration under the MMA scheme is made. The agreement also provides that if a party refuses to proceed with arbitration under the agreement, "the arbitrator will go forward with the arbitration hearing and render a binding decision" without the refusing party. In essence, if Mrs. Crespo had demanded arbitration under Florida Statutes, Petitioners could have withheld consent for twenty days after her demand and selected arbitrators who could render a decision Mrs. Crespo could not appeal under the terms of the agreement.

The agreement at issue diverges from the statutory provisions for terms more favorable to Petitioners, contravening legislative intent, in six major places: (1) the agreement does not concede Petitioners' liability;[7] (2) the agreement does not guarantee independent arbitrators or that one arbitrator be an administrative law judge as required by statute;[8] (3) the agreement shares costs equally between the parties rather than having Petitioners assume most of the costs of arbitration as in the statutory scheme;[9] (4) the agreement does not provide for Petitioners' payment

---

7. § 766.207, Fla. Stat. See also Bowers, 116 So. 3d at 1248; Phillipe, 769 So. 2d at 970.

8. § 766.207(4)-(5), Fla. Stat.

9. § 766. 207(7)(f)-(g), Fla. Stat.

of interest on damages;[10] (5) the agreement does not require joint and several liability of defendants as the MMA does;[11] and (6) the agreement dispenses with the right to appeal provided by the statute.[12]

As in the instant case, the agreement at issue in <u>Santiago</u> also provides for both parties to share costs equally. 135 So. 3d at 571. The district court in <u>Santiago</u> couched its approval of the agreement in its own interpretation of <u>Bowers</u>, finding that the cost-sharing provision was an agreement outside the MMA scheme and that the agreement never invoked the statute. <u>Santiago</u>, 135 So. 3d at 571 (citing <u>Bowers</u>, 116 So. 3d at 1248) ("The supreme court held that any agreement that seeks to enjoy the benefits of the arbitration provision <u>under the statutory scheme</u> must necessarily adopt all of its provisions."). While the district court was correct that "nothing in <u>Bowers</u> 'impede[s] the general enforceability of agreements to arbitrate,' " an agreement is void as against public policy where any of its provisions explicitly contradict those in the MMA. <u>Id.</u> (quoting <u>Bowers</u>, 116 So. 3d at 1251). In <u>Bowers</u>, we defended the freedom to contract around the MMA. We did not defend the freedom to ignore its balance of statutory

---

10. § 766.207(7)(e), Fla. Stat.

11. § 766.207(7)(h), Fla. Stat.

12. § 766.212(1), Fla. Stat.

incentives, which were designed to entice claimants and defendants to enter into arbitration.

We find that arbitration agreements which change the cost, award, and fairness incentives of the MMA statutory provisions contravene the Legislature's intent and are therefore void as against public policy. If the Legislature had intended for parties to pick and choose which of the MMA's provisions to include in their arbitration agreements, the MMA statutory scheme would be meaningless. Parties could avoid those statutory provisions less favorable to them as Petitioners did in this case and as defendants did in Santiago, thereby disrupting the balance of incentives the Legislature carefully crafted to encourage arbitration.

## V. CONCLUSION

Based on the foregoing, we find the agreement between Mrs. Crespo and Petitioners void as against public policy, approve the district court below, disapprove the Second District's decision in Santiago, and remand to the Fifth District Court of Appeal for further proceedings consistent with this opinion.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and PERRY, JJ., concur.
PARIENTE, J., concurs with an opinion.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

I write to respond to Justice Canady's dissent criticizing what he perceives

to be inconsistencies between the approach to whether there is a current medical

malpractice crisis in the majority's opinion in this case and our opinion in Estate of

McCall v. United States, 134 So. 3d 894 (Fla. 2014), as well as my concurring in

result opinion in McCall.[13] The majority opinion in this case is based on this

Court's reasoning in Franks v. Bowers, 116 So. 3d 1240 (Fla. 2013), which held a

similar arbitration agreement void as against public policy. Just like in this case,

Justice Canady dissented in both McCall and Bowers.

Unlike McCall, this case does not involve an attempt to declare the entire

medical malpractice statute unconstitutional; nor does it involve an attack on

statutory caps on noneconomic damages.[14] In those contexts, whether a medical

---

13. See McCall, 134 So. 3d at 916 (Pariente, J., concurring in result).

14. This was the issue in McCall, in which this Court concluded that the statutory cap on wrongful death noneconomic damages under "section 766.118 violates the Equal Protection Clause of the Florida Constitution under the rational basis test." 134 So. 3d at 905. This is also the issue of another case pending before this Court based on the Fourth District having held the caps on noneconomic damages to be unconstitutional. N. Broward Hosp. Dist. v. Kalitan, 174 So. 3d 403 (Fla. 4th DCA 2015) (pending case No. SC15-1858). The Second District Court of Appeal recently agreed with "the Fourth District's conclusion that the statutory cap on noneconomic damages is unconstitutional" in Port Charlotte HMA, LLC v. Suarez, No. 2D15-3434, 2016 WL 6246703 (Fla. 2d DCA Oct. 26, 2016).

malpractice crisis existed or currently exists would be a very relevant

consideration.

Rather, at issue in this case is the same type of arbitration agreement that this

Court held void as against public policy in <u>Bowers</u>, 116 So. 3d 1240. As I

explained in my concurrence in <u>Bowers</u>:

> It is therefore clear from a full review of the Medical Malpractice
> Statute that the legislative quid pro quo for patients in exchange for
> both a substantial limitation on noneconomic damages to a maximum
> of $250,000 per incident and the right to a jury trial was that a
> defendant would be required to admit liability. This clearly expressed
> public policy in the statute, however, has been expressly contravened
> by the Financial Agreement in this case, which eviscerates statutory
> rights without providing the injured patient with any of the added
> benefits or incentives provided for by the Legislature. Further, by
> requiring arbitration without in turn requiring the counter-balance of
> the defendant admitting liability, the Financial Agreement undermines
> the public policy set forth in the statute of reducing attorney's fees,
> litigation costs, and delay.

<u>Id.</u> at 1254 (Pariente, J., concurring). The existence or non-existence of a medical

malpractice crisis, therefore, does not affect whether an arbitration agreement is

void as against public policy. Instead, as the majority concludes in this case, and

we held in <u>Bowers</u>, the arbitration agreement at issue is invalid as against public

policy because it "change[s] the cost, award, and fairness incentives of the MMA

statutory provisions," which "the Legislature specifically created." Majority op. at

15, 9.

For all these reasons, I concur with the majority opinion.

CANADY, J., dissenting.

Because I adhere to my dissenting view in Franks v. Bowers, 116 So. 3d 1240 (Fla. 2013), I would quash the decision on review and approve the result reached by the Second District in Santiago v. Baker, 135 So. 3d 569 (Fla. 2d DCA 2014), on the conflict issue.

As I explained in Bowers:

> Nothing in the [Medical Malpractice Act] can be read to support the conclusion that the purpose of the statute is thwarted by voluntary pre-dispute agreements . . . designed to limit the cost of litigation and the amount of paid claims. Instead, such voluntary agreements are designed to cure the same mischief that the statute seeks to address.

Bowers, 116 So. 3d at 1255 (Canady, J., dissenting). It is no less true now than when Bowers was decided that "the public policy" animating the Court's decision "is an unprecedented judicial policy that contravenes" not only "the declared objective of the Legislature set forth in section 766.201" but also "the public policy embodied in the Florida Arbitration Code." Id. at 1256.

Bowers involved "an astonishing irony" because it employed a "line of judicial reasoning that condemns as invalid a voluntary agreement designed to limit the expense of medical malpractice litigation and grounds that condemnation on the purpose of a statute expressly designed to limit the expense of medical malpractice litigation." Id. Here, the irony is joined with blatant self-contradiction. The foundation of the legislative public policy articulated in

- 18 -

<u>Bowers</u>—the case on which the majority (incorrectly) hangs its hat—was the existence of a medical malpractice crisis. <u>See id.</u> at 1247 (majority opinion) ("[W]e have clarified the stated policy and intent of the Act—to address the 'overpowering public necessity' created by the medical malpractice insurance crisis."). But since <u>Bowers</u> was decided, that policy has been (incorrectly) rejected by a majority of the Court. <u>See</u> <u>Estate of McCall v. United States</u>, 134 So. 3d 894, 914 (Fla. 2014) (plurality opinion) (stating that "even if there had been a medical malpractice crisis in Florida at the turn of the century, the current data reflects that it has subsided"); <u>id.</u> at 921 (Pariente, J., concurring in result) (stating that "[t]here is no evidence of a continuing medical malpractice crisis"). In condemning the arbitration agreement based on the reasoning of <u>Bowers</u>, the majority relies on a crisis that the majority has said is nonexistent.

POLSTON, J., concurs.

Application for Review of the Decision of the District Court of Appeal – Certified Direct Conflict of Decisions

     Fifth District - Case No. 5D14-759

     (Orange County)

Dinah Stein and Mark Hicks of Hicks, Porter, Ebenfeld & Stein, P.A., Miami, Florida; and Thomas Earle Dukes, III, and Ruth C. Osborne of McEwan, Martinez & Dukes, P.A., Orlando, Florida,

     for Petitioners

- 19 -

Bryan Scott Gowdy and Jessie Leigh Harrell of Creed & Gowdy, P.A., Jacksonville, Florida,

    for Respondents