IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2017 Term

_____

Nos. 16-0603 and 16-0955

_____

FILED

**November 2, 2017**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

DORIS E. YOUNG, Individually and in Her Capacity as the Administratrix of the Estate
of Gary Ray Young,
Defendant Below, Petitioner

v.

GARY DOUGLAS YOUNG,
Plaintiff Below, Respondent.

_____

Appeal from the Circuit Court of Putnam County
The Honorable Philip M. Stowers, Judge
Civil Action No. 14-C-129

REVERSED AND REMANDED

_____

Submitted: September 20, 2017
Filed: November 2, 2017

Harvey D. Peyton                          Perry W. Oxley, Esq.
Thomas H. Peyton                          J.E. White, Jr., Esq.
Peyton Law Firm, PLLC                     J. Jarrod Jordan, Esq.
Nitro, West Virginia                      Anspach Meeks Ellenberger LLP
Counsel for the Petitioner                Charleston, West Virginia
                                          Counsel for the Respondent

JUSTICE WALKER delivered the Opinion of the Court.

CHIEF JUSTICE LOUGHRY and JUSTICE KETCHUM dissent and reserve the right to
file a dissenting opinion.

SYLLABUS BY THE COURT

1.    "A circuit court's entry of summary judgment is reviewed *de novo*." Syllabus Point 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

2.    "No promise is good in law unless there is a legal consideration in return for it."  Syllabus Point 1, *Thomas v. Mott*, 74 W. Va. 493, 82 S.E. 325 (1914).

3.    "A valuable consideration may consist either in some right, interest, profit or benefit accruing to the one party or some forbearance, detriment, loss or responsibility given, suffered, or undertaken by the other."  Syllabus Point 1, *Tabler v. Hoult*, 110 W. Va. 542, 158 S.E. 782 (1931).

4.    "The promise of a party to a contract, in order to be a good consideration for the undertaking of the other party thereto, must be such as to impose a legal liability.  Where the promise relied upon as constituting the consideration for the contract does not impose any legal liability upon the promisor, it will not ordinarily be held to be a sufficient consideration on the part of the other party." Syllabus Point 2, *Banner Window Glass Co. v. Barriat*, 85 W. Va. 750, 102 S.E. 726 (1920).

5.    If a contract or a contract term is substituted for a will such that it prevents an electing surviving spouse from receiving the full value of his or her

distributive share of marital property owned by his or her spouse at the time of death, the contract or contract term is unenforceable as against the electing surviving spouse for the purposes of determination of his or her elective share.

WALKER, Justice:

Gary Ray Young (Decedent) and his son Gary Douglas Young (Decedent's son) formed a partnership in 1985. After Decedent died without a will in 2016, a dispute arose between Decedent's son and Decedent's wife of more than thirty years, Doris Young (Mrs. Young) about the disposition of Decedent's one-half interest in the partnership, which Mrs. Young has valued at approximately $1 million. Decedent's son claims that he has a valid contractual option to purchase Decedent's entire one-half interest in the partnership for $50,000 according to an option agreement executed between Decedent and his son in 1987. Mrs. Young contends that her elective share should be based upon the full value of the partnership rather than upon the option price of $50,000.

Mrs. Young instituted this appeal to challenge the circuit court's summary judgment determination that the option agreement was supported by consideration and that the option price of $50,000 would be used in calculating her elective share. Upon review, we conclude that the option agreement was unsupported by consideration and testamentary in nature, executed in the guise of a partnership agreement. Further, we find that the option agreement, as structured, contradicts the public policies and principles of the elective share statutory scheme and is unenforceable against Mrs. Young for the purposes of determining her elective share.

1

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Decedent married Mrs. Young on April 9, 1982.  While Decedent had two children from a previous marriage – Gary Young and Rita Marion – he did not have any children with Mrs. Young.  During his marriage to Mrs. Young, Decedent and his son formally organized their partnership, G&G Investments, by executing the Agreement of Partnership ("1985 Partnership Agreement") on December 9, 1985.  Decedent and his son were the only two partners.  As to the partnership's disposition upon death of one of the partners, the 1985 Partnership Agreement provided:

> In the event of the death of one of the partners prior to the otherwise termination of the partnership, the partners hereby irrevocably grant to each other the exclusive right and option to purchase such deceased partner's interest in the partnership property from the estate of such deceased partner for an amount equal to one-half of the net book value of the partnership property as of the date of such partner's death, it being the intent of the partners that the surviving partner shall receive all of the partnership property.

On October 14, 1987, Decedent and his son amended their partnership agreement by executing an Amended Partnership Agreement for G&G Investment, a West Virginia Partnership ("1987 Partnership Agreement").   The new agreement contained the same terms as the 1985 Partnership Agreement except for the provision relating to the partnership's disposition on the death of one of the partners.   This provision was amended to read as follows:

> In the event of the death of one of the partners prior to the otherwise termination of the partnership, the deceased partner's interest in the partnership shall be governed by the

2

provisions of a separate contract between all the partners hereto. The heirs, executors, administrators, or legal representatives of a deceased partner shall be bound by that separate contract.

That same day, Decedent and his son executed a new document – the G&G Investments Purchase and Sale Agreement ("Option Agreement") giving Decedent's son the option to purchase Decedent's undivided one-half interest in the partnership for $50,000. The exact language is as follows:

> I.    In the event of the death of [Decedent], [Decedent's son] shall have the option to purchase [Decedent's] interest in the partnership for the amount of Fifty Thousand Dollars ($50,000.00), by providing the legal representative of the estate of [Decedent] written notice of such election within six (6) months of the date of death of [Decedent].
>
> [Decedent's] estate shall be paid in full the above referenced purchase price within one year after the notice of [Decedent's son's] election to purchase such interest. The above specified purchase price does not necessarily represent the fair market value of [Decedent's] interest in said partnership at the time of the formation of this agreement or in the future, but represents the amount [Decedent] desires [his son] to pay in order to receive full ownership of the partnership and its assets.
>
> II.    On [sic] the event of the death of [Decedent's son] his interest in the partnership shall be assumed by his estate according to the terms and conditions set forth in his last will and testament.

G&G Investments operated under the 1987 Partnership Agreement until Decedent passed away on November 1, 2016, without a will. At the time of his death, the

3

partnership was worth significantly more than the $50,000 price in the Option Agreement.[1]

Twenty-one days after Decedent's death, his son notified Mrs. Young, the administratrix of Decedent's estate, of his intent to exercise his option to purchase Decedent's half of G&G Investments. Mrs. Young refused to convey the partnership interest. Decedent's son then filed a Petition for Declaratory Judgment and Associated Relief to compel the conveyance. Mrs. Young filed a counter-claim and cross-claim seeking a declaration of her rights to an elective share of the augmented estate. The parties both filed motions for summary judgment and sought the circuit court's review of whether the Option Agreement was valid and enforceable and how to value Decedent's partnership interest for the purpose of probate and assignment of Mrs. Young's elective share.

---

[1] As administratrix, Mrs. Young attempted to conduct a valuation of the partnership, but was not provided access to all of the necessary information. Mrs. Young alleges that even if the only assets used in the valuation are the real estate appraisal and the capital account, her husband's interest in the partnership is worth, at minimum, $1.1 million. She believes that the actual value is much higher. Decedent's son has not contested any valuation figure. The value of the partnership interest presents a question of fact for the court. While we recognize that valuation of a partnership is a complicated process and that Mrs. Young's valuation does not reflect an actual final product of that process or an official valuation, for purposes of this appeal we rely upon the only valuation in the record – $1.1 million – as the value of Decedent's interest in the partnership.

4

The circuit court determined that the Option Agreement was valid and enforceable because it was incorporated by reference in the 1987 Amended Partnership Agreement and therefore was supported by consideration because that underlying agreement was supported by consideration. Next, the circuit court recognized two competing interests – on the one hand, freedom of contract, and on the other, a statutory scheme aimed at preventing disinheritance of a spouse. As a solution, the circuit court devised a balancing test to determine which interest should prevail, considering whether the consideration was more than a nominal sum, whether there was a legitimate business purpose for the transfer, and whether the agreement was in place for a sufficient period of time in order to abate concerns that the transfer was solely designed to defeat the spouse's elective share claim.

Having already determined that the Option Agreement was valid, enforceable, and supported by consideration, the circuit court found that determination of partnership interest at death was a legitimate business purpose, and that the agreement had been in effect for more than thirty years, so there was no evidence that it was designed solely to defeat the spouse's elective share claim. Thus, pursuant to the balancing test created by the circuit court, all factors weighed in favor of Decedent's son's contractual claim to the partnership property over Mrs. Young's elective share.

5

On appeal, Mrs. Young contends that the Option Agreement was unsupported by consideration and an attempted testamentary disposition of property, and that the circuit court's balancing test imparted an element of intent to disinherit, when there is no such requirement under the elective share statutes. Additionally, Mrs. Young asserts that "the public policy and purpose of the elective share statute dictates the inclusion of [Decedent's] partnership interest in his probate estate for the purpose of elective share just as if it were being considered a part of his marital estate for equitable distribution."

## II. STANDARD OF REVIEW

The issues before us arise from a grant of summary judgment. It is well established that "[a] circuit court's entry of summary judgment is reviewed *de novo*."[2]

## III. ANALYSIS

Mrs. Young raises two interrelated arguments on appeal. First, she argues that the Option Agreement is unenforceable because it lacks consideration and is an attempted testamentary disposition that is not compliant with the Statute of Wills.[3] Second, she argues that even if the Option Agreement is enforceable, the purchase price

---

[2] Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

[3] W. Va. Code §§ 41-1-1 to 5-20 (2014).

is not binding on a surviving spouse electing against her intestate share because the public policy and purpose of the elective share statute requires that the actual value of the partnership be included in the estate for calculation of her elective share. Decedent's son counters that the Option Agreement is valid and specifically enforceable because his contractual right to purchase Decedent's partnership interest is superior to Mrs. Young's claim as a surviving spouse.

We preface our analysis with a discussion of the elective share statutory scheme[4] in order to consider Mrs. Young's challenges to the validity and enforceability of the Option Agreement in context. The elective share statute, which codifies rights of a surviving spouse against disinheritance, provides:

> The surviving spouse of a decedent who dies domiciled in this state has a right of election, against either the will or the intestate share, under the limitations and conditions stated in this part, to take the elective-share percentage of the augmented estate, determined by the length of time the spouse and the decedent were married to each other [as determined by the statutory schedule].[5]

---

[4] W. Va. Code §§ 42-3-1 to -7 (2014).

[5] W. Va. Code § 42-3-1(a) (2014).

The statutory schedule provides that after fifteen years of marriage, a surviving spouse is entitled to fifty percent of the "augmented estate."[6] The "augmented estate" is composed of the probate estate as well as the "reclaimable estate," both of which are used to value the spouse's elective share.[7] The "reclaimable estate" returns to the estate, for purposes of calculation of the elective share, certain nonprobate assets the now-decedent spouse transferred to persons other than his spouse or held with persons other than his spouse with right of survivorship.[8]

According to the statute, Mrs. Young is entitled to elect against her intestate share and receive fifty percent of the augmented estate based on the length of her marriage to Decedent. The critical inquiry before us is whether the partnership property at issue in the Option Agreement should be included in the augmented estate. In order to resolve this question, we must decide whether the Option Agreement included the requisite consideration or if it merely was an instrument through which assets were transferred at death outside of the probate process. Finally, we must weigh the competing public policies at issue. With this context in mind, we turn to an analysis of the validity of the Option Agreement.

---

[6] W. Va. Code §42-3-1(a) (2014).

[7] W. Va. Code § 42-3-2 (b) (2014).

[8] *Stuter v. Fortin ex rel. Estate of Stuter*, No. 12-1185, 2013 WL 3184642 at *1 (W. Va. June 24, 2013) (memorandum decision).

8

## A.     *Failure of Consideration*

We have acknowledged "[t]hat consideration is an essential element of, and is necessary to the enforceability or validity of a contract is so well established that citation of authority therefor is unnecessary."[9]  Further, "[n]o promise is good in law unless there is a legal consideration in return for it."[10]  And, "where there is no benefit moving to the promisor or damage or injury to the promisee, [the contract] is void."[11]  Consideration is a broad term; we have stated that "[a] valuable consideration may consist either in some right, interest, profit or benefit accruing to the one party or some forbearance, detriment, loss or responsibility given, suffered, or undertaken by the other."[12]

Decedent's son argues that because the Option Agreement is incorporated by reference into the 1987 Partnership Agreement, it need not be supported by separate consideration because it benefits from the consideration given in the 1987 Partnership Agreement.  Decedent's son further argues that the Option Agreement on its face states

---

[9] *First Nat. Bank of Gallipolis v. Marietta Mfg. Co.*, 151 W. Va. 636, 642, 153 S.E.2d 172, 177 (1967)

[10] Syl. Pt. 1, *Thomas v. Mott*, 74 W. Va. 493, 82 S.E. 325 (1914).

[11] Syl. Pt. 2, in part, *Sturm v. Parish*, 1 W. Va. 125, 144 (1865).

[12] Syl. Pt. 1, *Tabler v. Hoult*, 110 W. Va. 542, 158 S.E. 782 (1931).

that the agreement was made "[i]n consideration of the promises, and the mutual covenants herein contained, and other good and valuable consideration."

Indeed, we have held that so long as a multi-clause contract overall is supported by consideration, separate consideration is not required for each promise contained within it.[13] Decedent's son's contention on this point is inapplicable, however, when one considers that the 1987 Partnership Agreement contains the *exact* same terms of the 1985 Partnership Agreement, except for the provision referring to a "separate contract" governing disposition of a deceased partner's interest (Buy-Sell Provision). By its terms, the 1987 Amended Partnership Agreement is a *single* modification of the 1985 Partnership Agreement for the sole purpose of including the Buy-Sell Provision.

Under these circumstances, the Option Agreement requires new consideration. We have determined that "not only must such modification or alterations be by mutual agreement but must be based upon a valid consideration, and the original consideration . . . cannot be used as consideration for any agreement of modification or alteration in connection therewith."[14] Similarly, we have held that "[c]onsideration is an essential element of a valid contract, and it is axiomatic that past consideration already

---

[13] *See* Syl. Pt. 6, *Dan Ryan Builders, Inc. v. Nelson*, 230 W. Va. 281, 737 S.E.2d 550 (2012).

[14] *Steinbrecher v. Jones*, 151 W. Va. 462, 470, 153 S.E.2d 295, 301 (1967).

given for a previous agreement cannot constitute valid consideration for a new agreement."[15] Thus, even if we were to find that the terms of the Option Agreement were incorporated by reference, the terms of the 1987 Partnership Agreement cannot provide consideration for the Buy-Sell Provision because it remained unchanged and already bound the parties. The Buy-Sell Provision is a modification of the original 1985 Partnership Agreement and requires new consideration.

In light of that finding, we turn to whether, standing alone, the promises contained in the Option Agreement are supported by consideration. The Option Agreement is prefaced with the language "[i]n consideration of the promises, and the mutual covenants herein contained, and other good and valuable consideration, it is hereby agreed . . . ." Initially, we dispose of Decedent's son's argument that this bare recital of consideration alone somehow creates consideration. While a recital of consideration containing a sum paid or detriment undertaken in return for the promises made in the agreement may be sufficient consideration, the recital here contains no such statement.[16] Decedent's son has neither argued nor demonstrated that the "good and

---

[15] *Chesapeake Appalachia, L.L.C. v. Hickman*, 236 W. Va. 421, 439, 781 S.E.2d 198, 216 (2015) (citing Syl. Pt. 1, *Cole v. George*, 86 W. Va. 346, 103 S.E. 201 (1920) ("An agreement by one to do what he is already legally bound to do is not a good consideration for a promise made to him.")).

[16] *See, e.g.*, *Oates v. Oates*, 127 W. Va. 469, 476, 33 S.E.2d 457, 460 (1945) ("Plaintiff recites in his deed the receipt of ten dollars as a consideration for his

(continued . . .)

11

valuable consideration" recited references that he paid any sum in return for the option, undertook additional duties in the partnership, bore more losses, or any other manifestation of consideration that may not be apparent from the four corners of the document. Accordingly, we limit our review of applicable consideration to the language in the Option Agreement relating to the promises and mutual covenants made.

The Option Agreement is, in contractual terms, a promise in return for a promise. Decedent promises that on his death, his son has the option to purchase his interest in the partnership for $50,000. Decedent's promise further acknowledges that $50,000 is not representative of the actual fair market value at the time of executing the agreement or in the future, but is the amount he desired his son to pay for full ownership. His son, in turn, promises that upon his death, his interest in the partnership is assumed by his estate according to his will.

In theory, because this agreement purports to be a bilateral agreement, the consideration given by Decedent's son could be either (1) realization of Decedent's desire to have his son take over the business; or (2) his return promise to allow his estate to assume his partnership interest on his death according to his will. As discussed below, both of these fail because they are legally insufficient consideration.

conveyance to the defendant. This recital, although open to explanation and contradiction, is *prima facie* evidence of the payment thereof.") (citation omitted).

12

With respect to Decedent's promise, the language of the Option Agreement makes it clear that Decedent was motivated to enter into the agreement in order to provide a means for his son to assume his partnership interest on his death at a certain price, if his son so elected, regardless of its actual value. Other jurisdictions have concluded that the motives behind a party's decision to enter into a contract are insufficient to enforce it in the absence of actual consideration. Citing the litany of other jurisdictions that have concluded motive as legally insufficient[17] consideration, Williston on Contracts § 7.17 explains:

> if there is no legal consideration, no mere motive, such as love and affection, close friendship or a desire to do justice, or a desire to avoid trouble, or to equalize the shares in an estate, or provide for a child, or to express regret for having caused some difficulty, will support a promise. Unlike the "causa" in the Roman or civil law, consideration is a present exchange bargained for in return for a promise. "Causa" is some adequate reason for making a promise, and may be either a present exchange or an existing state of facts.[18]

[17] We note here that there is a distinct difference between legally insufficient consideration and the adequacy of consideration. The former contemplates that, by operation of law, there is no consideration, whereas the latter concerns whether the legally sufficient consideration given is adequate to justify the magnitude of the promises made in an agreement.

[18] 3 Williston on Contracts § 7.17 (4th ed. 2017) (citing cases from Alabama, California, Connecticut, Illinois, Indiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, Texas, West Virginia, and Wisconsin as standing for the proposition that motive is legally insufficient consideration) (citations omitted).

13

Further, the concepts of consideration and motive are distinguished in *Prudential Preferred Properties v. J and J Ventures, Inc.*:[19]

> the court discussed the difference between consideration and motive, making clear that the two concepts are distinct and must not be confused; that although one consideration may support multiple promises, at least one consideration must be present for any promise to be enforceable; and that while consideration is essential to any binding promise, the motivation of the promisor or promisee is largely irrelevant, at least when there is an absence of the requisite consideration; the court said: "Ultimately, in testing to determine if consideration is present, the court is asking: *'What did you give to get what you got?'"*[20]

Thus, we find that while Decedent may have contemplated that his motives would be accomplished by entering into the Option Agreement, accomplishment of intent or motive alone is legally insufficient to serve as consideration for this Option Agreement.[21]

Likewise, the inquiry "what did you give to get what you got?" is instructive to our analysis of Decedent's son's return promise – that is, what did Decedent's son give to get full ownership of the partnership at $50,000, regardless of its

---

[19] 859 P.2d 1267 (Wyo. 1993).

[20] 3 Williston on Contracts § 7.17 (4th ed. 2017) (citing *Prudential Preferred Properties v. J and J Ventures, Inc.* 859 P.2d 1267 (Wyo. 1993) (emphasis added)).

[21] 3 Williston on Contracts § 7.17 (4th ed. 2017).

actual value? Facially, as noted above, the Option Agreement is executed as an exchange of two promises. In actuality, Decedent's son gave up nothing to receive full ownership of the partnership at the $50,000 price. To be clear, this is not an exchange of reciprocal and mutual options for the partners to buy out one another's interest at death typical of buy-sell agreements in partnerships. Rather, Decedent gave his son the right to buy out his ownership interest for the arbitrary figure of $50,000 at his death regardless of its actual value, and his son, in return, only promises to do with his ownership interest what he so chooses.

In examining non-reciprocal options such as the Option Agreement, we find this discussion by the Court of Appeals of Kentucky instructive:

> There is no requirement of the law that for each right created by a contract in one party the other party must have a reciprocal right of the same nature. . . . The crucial question is whether the nature of the unilateral option is such that the party to whom it is granted has in actuality no fixed obligations under the contract. If so, his promise to perform is illusory in the sense that he has made no legally enforceable commitment . . . ."[22]

Further, comparing the doctrine of mutuality of obligation to the theory of consideration in the law of contract, the Kentucky court expounded that:

---

[22] *David Roth's Sons, Inc. v. Wright & Taylor, Inc.*, 343 S.W.2d 389, 390-91 (Ky. 1961).

15

the doctrine of mutuality of obligation (as distinguished from mutuality of assent of remedy) is closely related to the theory of consideration in the law of contracts. Where an agreement is founded solely upon reciprocal promises, unless each party has assumed some legal obligation to the other the contract is wanting in consideration and lacking in mutuality.[23]

As to contracts for which a return promise supplies the requisite consideration, we have held:

The promise of a party to a contract, in order to be a good consideration for the undertaking of the other party thereto, must be such as to impose a legal liability. Where the promise relied upon as constituting the consideration for the contract does not impose any legal liability upon the promisor, it will not ordinarily be held to be a sufficient consideration on the part of the other party.[24]

Succinctly put,

[t]hat a promise of one may be valid consideration for the promise of another is well settled. It is equally as well settled, however, that in order for such a promise to be a good consideration for the promise of the other party, it must be such as legally binds the promisor so that an action for the breach thereof might be maintained against him.[25]

In this case, Decedent's son made no additional promise and imposed no additional obligation upon himself that he did not already have – he merely agreed to dispose of his

---

[23] *Id.* at 390 (citation omitted).

[24] Syl. Pt. 2, *Banner Window Glass Co. v. Barriat*, 85 W. Va. 750, 102 S.E. 726 (1920).

[25] *Id.* at 752, 102 S.E. at 727.

16

property in accordance with his will.  His return promise imposed no legal duty on him; his station before and after the execution of the contract remained utterly unchanged, and, had Decedent's son breached the contract, Decedent would have had no recourse against him.  We have held in similar circumstances that in the absence of consideration passing in exchange for a promise, "it [is] no more than an executory promise to make a gift, and it is well settled that a promise to make a gift in the future is of no effect . . . until the subject matter of the gift has actually been delivered to the donee . . . ."[26]  Accordingly, under these circumstances, the exchange of these promises, in the absence of other consideration, is legally insufficient consideration.

### B.      *Testamentary Disposition and the Elective Share Statutory Scheme*

We next examine whether the Option Agreement is in effect a testamentary disposition, or, in other words, a means by which Decedent could make a gift to take effect at the time of his death without complying with the Statute of Wills.  Decedent's son argues that he was not given the partnership property outright; he is made to pay $50,000 in return for it – thus, it is not gratuitous and, therefore, not testamentary.  It is clear to us, however, that this option was not executed at arm's length and is Decedent's substitute for a will under the guise of a partnership agreement.  That is, there is an agreement that is otherwise unsupported by consideration, to take effect at death,  which vests in Decedent's son an option to purchase his share of the partnership for an arbitrary,

---

[26] *Id.* at 752-53, 102 S.E. at 727.

fixed price, regardless of its actual value, and whose actual value is appraised at twenty times the arbitrary, fixed option price.  The failure of Decedent and his son to choose a price rationally related to the actual value of the partnership coupled with the fact that this is a one-sided option to convey an interest at death for far less than full and adequate consideration makes it clear that this agreement served as a device for Decedent to pass interest to his son outside of probate and for that reason the Option Agreement is a will substitute.

> The Restatement of Property states that a will substitute
>
> serves the function of a will because it is an arrangement respecting property or contract rights that is established during the donor's life under which (1) the right to possession or enjoyment of the property or to a contractual payment shifts outside of probate to the donee at the donor's death; and (2) substantial lifetime rights of dominion, control, possession, or enjoyment are retained by the donor.[27]

This Option Agreement is a textbook example of a will substitute – the option vested a contract right in Decedent's son during Decedent's life, but which he would not enjoy until the death of Decedent because Decedent retained full control over the partnership property and its proceeds during his life.  As such, the will substitute is subject to the elective share statute:

> Although the validity of a will substitute does not depend on its being executed in compliance with the statutory

---

[27] Restatement (Third) of Property (Wills & Don. Trans.) § 7.1 (2003).

formalities required for a will, a will substitute serves the function of a will. It shifts the right to possession or enjoyment to the donee at the donor's death. In this sense, a will substitute is in reality a nonprobate will. A will substitute is therefore, to the extent appropriate, subject to substantive restrictions on testation and to rules of construction and other rules applicable to testamentary dispositions.[28]

More specifically,

[c]onstruing and applying the [elective share] statute broadly according to its purpose . . . the statute [leaves] no opening for ingenuity to enable a husband to remain during his life in full dominion of his property and yet to dispose of the same after death to the exclusion of his widow from her distributive share. The right of a widow to her share of the estate owned by her husband at the time of his death *is impregnable or it is not existent at all*[.][29]

It is plain that Decedent wanted his son to have his share of the partnership for $50,000 – there is no evidence that Decedent was coerced into this agreement. Nonetheless, the elective share is a statutorily imposed restriction on the freedom of contract and on the alienation and devise of property when it infringes upon the rightful share of the surviving spouse. Thus, even if a valid contract were executed between

---

[28] *Id.* at § 7.2.

[29] 85 A.L.R.4th 418 (1991) (discussing *Fleming v. Fleming*, 180 N.W. 206 (Iowa 1920)) (emphasis added).

Decedent and his son,[30] when viewed in the face of an elective share claim by the surviving spouse, the $50,000 option price cannot be enforced against her to the extent it does not satisfy her full statutory share.[31] Indeed, the statutory framework of the elective share statute explicitly exempts from the reclaimable estate transfers for which "full and adequate consideration in money or money's worth"[32] was given in exchange for the property, understandably, because the decedent's estate would have already been compensated for the value of that asset during his life or at death.[33] Here, however, the

---

[30] Of course, a surviving spouse's share is dictated by the percent ownership owned by his or her deceased spouse at the time of death. Thus, had the agreement previously been amended to provide, for example, that the son would be responsible for a larger percentage of the work or responsibility for the business and the percentage ownership were amended to reflect that shift, that agreement would be unaffected by this Opinion.

[31] *See Rubeinstein v. Mueller*, 225 N.E.2d 540 (N.Y. 1967) (citing with approval cases holding that a former wife's right to specific enforcement of a separation agreement to make a will leaving property to the former spouse or children must give way to the spouse's elective share); *Buehrle v. Buehrle*, 126 N.E.539 (Ill. 1920) (husband could not by an agreement with his business partner deprive his widow of her rights in his estate where agreement was entered during the marriage); *Keats v. Cates*, 241 N.E.2d 645, 652 (Ill. App. Ct. 1968) (stating the general rule that a contract to devise or bequeath property which is entered into during the marriage cannot defeat the rights of the surviving spouse unless such surviving spouse has relinquished her rights in some other way).

[32] Although not implicated here, we note that the Legislature has also exempted transactions from the augmented estate if the transfer was irrevocably made with the written consent or joinder of the surviving spouse. W. Va. Code § 42-3-2(c) (2014).

[33] W. Va. Code § 42-3-2(c)(i) (2014). This Court takes special notice that the language of this code provision provides that transfers made in exchange for "full and adequate consideration in money or money's worth" are excluded from the reclaimable estate, as opposed to the probate estate. This statute defines the "probate estate" as

(continued . . .)

$50,000 option is one-sided and is not remotely related to the actual value of the partnership. Decedent's son argues that the $50,000 option price reflects the definition of fair market value because it is the price at which someone [Decedent] was willing to sell it. This argument is unavailing because that definition of fair market value assumes that the asset was available in the marketplace – in this case, the "price a buyer was willing to pay" was set by a contract that we have already discussed was not negotiated at arm's length. To conclude that the option price reflects the fair market value would also require us to reach the illogical conclusion that the partnership's fair market value is $50,000 if Decedent dies first, but $1.1 million if Decedent's son died first. We decline to do so. Rather, as to the enforceability of an option price on a non-consenting spouse, we find the

---

"property, whether real or personal, movable or immovable, wherever situated, that would pass by intestate succession if the decedent died without a valid will." W. Va. Code § 42-3-2(a)(iv) (2014). Conversely, the reclaimable estate, as provided for in W. Va. Code § 42-3-2 (b)(2)(iii)(A), includes:

> property transferred by the decedent to any person other than a bona fide purchaser at any time during the decedent's marriage to the surviving spouse, to or for the benefit of any person, other than the decedent's surviving spouse, if . . . the decedent retained at the time of his or her death the possession or enjoyment of, or right to income from the property[.]

Although the partnership property itself would not have transferred until the option was exercised, we nevertheless find this language instructive in the context of an option vesting in Decedent's son a contract right to take effect at death for less than full and adequate consideration. Ultimately, however, the fact that Decedent owned this property at the time of his death and our conclusion that this is a will substitute would indicate that this partnership property is considered part of the probate estate.

21

system of equitable distribution more instructive because the issues presented and public policies at stake are common to both contexts where marital property is involved.

When dividing assets through equitable distribution, the majority of jurisdictions have not considered a fixed price in a partnership or corporate buy-sell agreement as binding on the other spouse when he or she did not consent to it or was not otherwise bound by its terms.[34] Instead, it is a factor to be weighed in evaluating the asset because "the price established for buy-out purposes . . . is often artificial and does not always reflect true value."[35] Looking at the totality of the circumstances in this case, not only was Decedent deprived of any reciprocal right to buy the partnership at the same price had the son died first, but upon Decedent's death, his estate was only nominally compensated for property Decedent died owning.

---

[34] *See In re Marriage of Keyser*, 820 P.2d 1194 (Colo. Ct. App. 1991) (stating majority rule and noting that some courts hold that buy-sell provisions presumptively control value, while a small minority regard the value specified in the agreement as controlling).

[35] *Bosserman v. Bosserman*, 384 S.E.2d 104 (Va. 1989). *See also, Bettinger v. Bettinger*, 183 W. Va. 528, 396 S.E.2d 709 (1990) (under West Virginia law, a buy-sell agreement setting stock value for equitable distribution purposes should not be considered binding, but rather should be weighed with other factors in determining the value of the stock).

As a matter of fundamental fairness, it is undisputed that this partnership was built entirely during the marriage with marital funds. We have recognized that "the elective share provision of the Revised Uniform Probate Code specifically was written in order to 'bring the elective share law into line with the contemporary view of marriage as an economic partnership.'"[36] Further, "[t]he purpose behind the elective-share provision set forth in W. Va. Code, 42-3-1 [1992] is to prevent spousal disinheritance in order to ensure that the surviving spouse's contribution to acquisition of property during the marriage is recognized and in order to ensure that the surviving spouse has continuing financial support after the death of his or her spouse."[37] Thus, to allow a contract void of consideration to divest a surviving spouse of her distributive share of marital property at the death of her spouse would provide a court-sanctioned means of hiding or diverting assets and would thereby emasculate the elective share statutes and undermine our equitable distribution laws. Accordingly, although we do not take the freedom to contract lightly, the Option Agreement, as written, is unenforceable because it "contravenes legislative intent in a way that is clearly injurious to the public good" in violation of public policy.[38]

---

[36] *Mongold v. Mayle*, 192 W. Va. 353, 355-56, 452 S.E.2d 444, 446-47 (1994) (citation omitted).

[37] *Id.* at 356, 452 S.E.2d at 447.

[38] *Franks v. Bowers*, 116 So.3d 1240, 1247 (Fla. 2013). *See also Cedillo v. Farmers Ins. Co. of Idaho*, 345 P.3d 213, 222-23 (Idaho 2015) ("An illegal contract is a

(continued . . .)

Under these circumstances, the freedom of contract must give way to the elective share statute. Decedent died owning his interest in a partnership created entirely with marital funds, and during his life subjected that interest to a one-sided option that, by its own terms, contemplated no semblance of actual or fair market value, rendering it quasi-testamentary and a will substitute. In the face of a claim of a surviving spouse, equity and the public policy behind the elective share statutes dictate that under these circumstances the option price is ineffective and the full value of the partnership must be included in the augmented estate for purposes of calculating Mrs. Young's elective share. Had this option been properly executed in a will, Mrs. Young would have the uncontroverted right to elect against that devise and the result should be no different when a will substitute is employed.[39] We have discussed that "there are numerous nonprobate devices which can be used to circumvent policy and thus diminish a surviving

---

contract that 'rests on illegal consideration consisting of any act or forbearance which is contrary to law or public policy.'") (citations omitted); 5 Williston on Contracts § 12.1 (4th ed. 2017) ("[I]t may be broadly said that a bargain will be declared illegal or unenforceable if: . . . '[T]he interest in enforcement [of a promise or term] is clearly outweighed in the circumstances by a public policy against the enforcement of such terms,' in which case the term will be unenforceable.") (citation omitted).

[39] Although intent to disinherit one's spouse need not be proven in order to take under the elective share statute, it is suspect that Decedent, who has been twice married, with children from a previous marriage, and considerable assets died without a will. Decedent's interest in G&G Investments was by far his largest asset at his death. Though neither essential nor required for our analysis, this reinforces the conclusion that the Option Agreement was a will substitute.

spouse's elective share," and we find that the Option Agreement employed here is one such device.[40] To hold that Mrs. Young is denied her share of the partnership because this testamentary disposition was executed in a "contract" rather than a will would honor form over substance and we decline to do so. Therefore, we conclude that if a contract or contract term is a substitute for a will such that it prevents an electing surviving spouse from receiving the full value of his or her distributive share of marital property owned by his or her spouse at the time of death, the contract or contract term is unenforceable as against the electing surviving spouse for the purposes of determination of his or her elective share.

## IV. CONCLUSION

For all of these reasons, we find that Mrs. Young is entitled to her elective share of Decedent's augmented estate, which includes the value of Decedent's undivided one-half interest in G&G Investments. We remand for the determination of the value of Decedent's undivided one-half interest in G&G Investments as calculated under the provisions of the Uniform Partnership Act.

Reversed and Remanded.

---

[40] *Johnson v. Farmers & Merchants Bank*, 180 W. Va. 702, 706, 379 S.E.2d 752, 756 (1989).

25